# LOS ANGELES *v.* LOS ANGELES CITY WATER COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF CALIFORNIA.

No. 148. Submitted March 15, 1900. — Decided April 30, 1900.

July 22, 1868, Los Angeles City leased to Griffin and others for a named sum its water works for a term of 30 years and granted them the right to lay pipes in the street, and to take the water from the Los Angeles River at a point above the dam then existing, and to sell and distribute it to the inhabitants of the city, reserving the right to regulate the water rates, provided that they should not be reduced to less than those then charged

by the lessees. The lessees agreed to pay a fixed rental, to erect hydrants and furnish water for public uses without charge, and at the expiration of the term to return the works to the city in good order and condition, reasonable wear and damage excepted. This contract was procured for the purpose of transferring it to a corporation to be formed, which was done. Subsequently the limits of the city were extended as stated by the court, and the expenses of the corporation were increased accordingly. The city subsequently established water rates below those named in the contract, and the company collected the new rates, without in any other way acquiescing in the change. This suit was brought by the company to enforce the original contract. *Held,*

(1) That the power to regulate rates was an existent power, not granted by the contract, but reserved from it with a single limitation, the limitation that it should not be exercised to reduce rates below what was then charged, and that undoubtedly there was a contractual element, but that it was not in granting the power of regulation, but in the limitation upon it.

(2) That the city of Los Angeles, by its solemn contract, and for various considerations therein stated, gave to the party under whom defendant claims, the privilege of introducing, distributing and selling water to the inhabitants of that city, on certain terms and conditions, which defendant has complied with, and it was not within the power of the city authorities, by ordinance or otherwise, afterward to impose additional burdens as a condition to the exercise of the rights and privileges granted.

(3) By acquiescing in the regulations of rates ever since 1880 the company is not estopped from claiming equitable relief and is guilty of no laches.

THIS suit involves the constitutionality of an ordinance of the city of Los Angeles, adopted February 23, 1897, fixing the water rates to be charged and collected by the Los Angeles City Water Company for the year ending June 30, 1898.

It is claimed that the ordinance impairs the obligation of the contract made with the grantors of the company on the 20th of July, 1868.

The facts were stipulated, and are substantially as follows:

On the 22d of July, 1868, the city of Los Angeles entered into a contract with John S. Griffin, P. Beaudry and Solomon Lazard, whereby it leased its water works to the said persons and their assignees for a term of thirty years, with the right to lay pipes in the streets of the city, and to sell and distribute the water for domestic purposes to the inhabitants of the city;

also with the right to take water from the Los Angeles River at a point at or above the present dam, to be selected within sixty days of the date of the contract. It was provided that no more than ten inches of water should be taken from the river without the previous consent of the mayor and common council.

The city bound itself not to make any other lease, sale, contract, grant or franchise to any person, corporation or company for the sale or delivery of water to the inhabitants of the city for domestic purposes during the continuance of the contract.

And it was provided "that the mayor and common council of said city shall have, and do reserve the right to regulate the water rates charged by the said parties of the second part, or their assignees, provided that they shall not so reduce such water rates or so fix the price thereof as to be less than those now charged by the parties of the second part for water; . . ."

The said persons agreed to pay the city a rental of fifteen hundred dollars for the water works; to lay down in the streets of the city twelve miles of iron pipes of sufficient capacity to supply the inhabitants with water for domestic purposes; to extend the pipes as fast as the citizens would agree to take sufficient water to pay ten per cent upon the cost of such extension; to erect one hydrant, as protection against fire, at one corner of each crossing of streets where pipes were or might be laid; to erect an ornamental fountain on the public plaza at a cost not exceeding $1000; to construct and erect, within two years, such reservoirs, machinery, ditches and flumes as would secure the inhabitants with a constant supply of water for domestic purposes; to furnish water free of charge for the public school houses, hospitals and jails; to keep in repair all of said improvements, at the cost and expense of the parties of the second part, for said term of thirty years, and to return said water works to said party of the first part at the expiration of said term, in good order and condition, reasonable wear and damage of the elements excepted, upon payment to said parties of the value of the aforesaid improvements, to be ascertained as provided for in the contract; to give a bond in the sum of twenty thousand dollars for the performance of said contract, and to pay all state and county taxes assessed upon the water works during the period of thirty years.

And as the Circuit Court found, 88 Fed. Rep. 720, 723:

"Griffin, Beaudry and Lazard applied for and procured said contract on behalf and for the benefit of themselves and other persons, with the intention of forming a corporation to carry out said contract, and afterwards, about the middle or latter part of August, 1868, themselves and said other persons being the incorporators, organized, under the laws of the State of California, the Los Angeles City Water Company, for the purpose of supplying the inhabitants of said city with water for domestic purposes, etc., under the terms of said contract; and assigned all their rights and franchises under said contract to said company by a written instrument dated June the 12th, 1869, and recorded in the office of the recorder of said county of Los Angeles, June the 15th, 1869.

"On April the 2d, 1870, the legislature of California passed an act hereinafter set forth, in terms ratifying and confirming said contract.

"Griffin, Beaudry and Lazard did nothing personally in carrying out said contract or constructing or maintaining said water works, but said company, after it had organized, took possession of said water works, and has performed all of the above-mentioned obligations of said contract, except the one providing for the return of the water works at expiration of lease, and, in such performance, has laid 320 miles of pipe, erected over 500 hydrants for protection against fire, and constructed six reservoirs, with an aggregate capacity of nearly sixty-six millions of gallons, and is now, as it has been at all times since the contract was made, furnishing the city of Los Angeles with water for the extinguishment of fires and for the public schools, hospitals and jails in said city free of charge. The aforesaid extensions of the water works were rendered necessary by the growth of said city, whose population in 1868 was between 5000 and 6000, and is now about 103,000.

"During the whole of the year 1868 the territorial limits of the city of Los Angeles were as follows: Four square leagues in a square form, the centre of which was the centre of the old pueblo plaza.

"About 1872 the limits were extended 420 yards south of

the former south boundary, and within the past three years, and prior to July, 1897, the limits were further extended so as to take in between ten and fifteen square miles of additional adjoining territory. Immediately after the extension of the said limits, the Los Angeles City Water Company began to extend its pipes over the said addition to the city as the same was settled up and improved, and ever since has been and is now furnishing water to the people in said district added to the original territory of the city, and, upon the demands of the city council, erected fire hydrants within the said additional territory and furnished water free of charge, and has in all respects continued to lay pipes, erect fire hydrants, and furnished the inhabitants with water for domestic uses in like manner as it has conducted the same business within the original limits of the city as established by the act incorporating it, and so with the more recent extensions of the city limits, to wit, those made within the last three years, the company has also extended its pipes in portions of those limits and furnished water in the same way.

"The quantity of water required to supply the domestic wants of the people of said city is one inch of water, measured under a four-inch pressure, to every one hundred inhabitants. To meet the increased demands upon it for water under said contract said company has, among other things, purchased the system known as the Beaudry system of water works, and also certain water rights in the Arroyo Seco, and conducted water from the Arroyo Seco into the city on the east side of the Los Angeles River, and has been furnishing the inhabitants of that portion of the city with water from said system, and also acquired the stock of the corporation known as the East Side Spring Water Company, the same mentioned in paragraph 10 of the complaint.

"In the growth of the city its settlement extended to localities of higher elevation than those occupied by its inhabitants at the time of said contract, and the point originally selected for the diversion of the water of the Los Angeles River for supplying the city and its inhabitants, as in said contract provided, was so located in said river that it was impracticable to

there maintain dams and diversion works that would not occasionally be swept away or rendered useless by floods, and the surface water of the river after severe storms became muddy and unfit for supplying the inhabitants with water for domestic uses, and in the year 1889 the Crystal Springs Land and Water Company made excavations in the places referred to in the bill of complaint and laid the pipes therein as alleged, and the water that has been used by the Los Angeles City Water Company for supplying the city with water, as provided in said contract, has ever since been obtained from that source, except that from time to time a further supply of water has been taken from the Los Angeles River in order to supply said inhabitants, which diversions have been at or near the place where the said underground pipes are laid, and that by these means the water can be delivered to the higher elevations, and the underground waters, as to quality and amount, are thus protected against the influences of floods.

"The Los Angeles City Water Company ever since its incorporation has taken more than ten inches of water, measured under a four-inch pressure, from the Los Angeles River, and the amount taken has increased with the increase of the population of the city and the demands of the municipality itself for water for extinguishing fires and the other public purposes referred to in the said contract, and the amount has increased until now it requires from 1000 to 1500 inches of water, measured under a four-inch pressure, for such purposes, and during the summer season the amount of water used by the Los Angeles City Water Company for the purposes aforesaid runs from 1000 to 1500 inches under a four-inch pressure, inclusive of the water obtained by the underground excavations, which latter furnish from 650 to 690 inches, measured under a four-inch pressure.

"The city of Los Angeles had always had flowing in the Los Angeles River, at the point from which said Los Angeles City Water Company has always diverted water from said river, a quantity of water sufficient to have supplied said Los Angeles City Water Company with all the water required to supply said city and its inhabitants with water for domestic purposes and

municipal uses, and has never objected, up to October 20, 1896, to said Los Angeles City Water Company taking as much water from said river as it might require for said uses, and during all of said period said city has never objected to said company's taking from the surface stream of said river at said point as much water as said company needed for said uses.

"On October the 19th, 1896, the city council of the city of Los Angeles adopted a resolution requiring the Los Angeles City Water Company to pay to the city of Los Angeles an amount of money equal to forty per cent of the gross rates received by said company from the consumers of water as rental for all water taken by said company from the Los Angeles River, and before the 21st day of October, 1896, to attorn to the city of Los Angeles, as tenant of said city, for all of the water so taken from said river, and to agree to pay said rental to said city, and in case of failure to attorn and agree to pay said rental, to refrain from diverting, taking or interfering with any of the water mentioned in said resolution (except ten inches) after the 20th day of October, 1896.

"On October the 19th, 1896, the city attorney, in writing, notified the Los Angeles City Water Company and the Crystal Springs Land and Water Company of said resolution, and demanded compliance therewith, delivering a copy of said resolution to each of said companies. Neither of them ever attorned to said city for said water or any part thereof, or ever agreed to pay any rental for the same. After the passage of said resolution and ever since said notification, up to the present time, the Los Angeles City Water Company has continually taken from the Los Angeles River, at a point above the northern boundary of said city, for the purposes of distribution and selling the same in said city, a quantity of water varying from 400 to 1000 inches, measured under a four-inch pressure.

"On the 19th day of April, 1870, the common council of the city of Los Angeles accepted, and the mayor approved, the following report:

"'To the honorable the mayor and common council of the city of Los Angeles and the Los Angeles City Water Company:

"'The undersigned commissioners, duly appointed on behalf

of your honorable bodies to adjust, fix and establish the rates and charges of the Los Angeles City Water Company, (a corporation duly incorporated under the laws of the State of California for the purpose of supplying the inhabitants of Los Angeles City with pure, fresh water), respectfully report that they have established water rates and charges for domestic purposes, taking as a guide as near as can be the charges and rates for domestic purposes charged in July, 1868; that your committee have also fixed the rates and charges for other reasonable objects and purposes, and report as follows, to wit.'

" Then follow the rates agreed upon.

" The commissioners referred to in said report had been previously selected, two by the city and two by the Los Angeles City Water Company.

" In June, 1871, the city council, on a report of a committee constituted similarly to the one above mentioned, established the same rates as those established in April, 1870.

" On the 13th of August, 1874, a committee, constituted in the same manner and for the same purposes as the committee already mentioned, reported that they had established water rates and charges for domestic purposes, taking as a guide, as near as possible, the charges and rates for domestic and other reasonable objects and purposes charged in July, 1868. The report was adopted and a committee appointed in conjunction with the city attorney to draft an ordinance embodying the rates fixed in said report, and thereafter, on August the 20th, 1874, an ordinance so drawn was adopted by the council of said city, and the rates established by said ordinance were the same as those established in 1870 and 1871.

"Since and including the year 1880 the city council of the city of Los Angeles has in February of each year passed an ordinance fixing the rates to be charged by all corporations and persons within said city supplying water to the inhabitants thereof, to be in force for one year from and including July the 1st, which rates have been less than the rates charged in 1870, as contained in the ordinance hereinbefore mentioned, and the Los Angeles City Water Company has collected the rates thus fixed by the city of Los Angeles, and no more; but in

the year 1896 the council of the city of Los Angeles passed an ordinance fixing the rates to be charged for water for the year commencing July the 1st, 1896, and ending June 30, 1897, at less than they had ever been fixed before, and a suit was then brought by the complainants herein in this court against the city of Los Angeles to set aside the said ordinance; and in February of the year 1897 the city of Los Angeles passed the ordinance which is assailed in this suit, making a still further reduction in the rates.

"The action of the Los Angeles City Water Company in collecting the rates fixed by said several ordinances constitutes the only acquiescence (if it be an acquiescence) in the action of said council.

"If the rates established in 1870 were collected for the year beginning July the 1st, 1897, and ending June the 30th, 1898, the revenues received by the Los Angeles City Water Company from said rates would be more than fifty thousand dollars in excess of the amount which would be received under the rates named in the ordinance of February, 1897.

"In January, 1882, the Los Angeles City Water Company furnished to the council of the city of Los Angeles a statement of its transactions for the preceding year; protesting at the same time against the establishment of any rates less than those which were in force at the date of the lease hereinbefore mentioned, to wit, July the 22d, 1868.

"In January, 1883, said company again furnished said council with a statement showing the names of the consumers of water, the rates paid during the year preceding the date of the statement, and also an itemized statement of the expenditures made for supplying water during the year preceding, but expressly denying any legal right on the part of the council to demand said statement or to fix any rates less than those which were in force in July, 1868.

"Similar statements, accompanied by similar protests, were made annually thereafter up to and including the year 1889, and since that time unverified statements or reports showing its receipts and expenditures have been made by said company to the city council each year.

"Article XIV of the present constitution of California, adopted in 1879, is as follows:

## " ' ARTICLE XIV.

### " ' *Water and Water Rights.*

" ' SECTION 1. The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental or distribution, is hereby declared to be a public use, and subject to the regulation and control of the State, in the manner to be prescribed by law: Provided, that the rates or compensation to be collected by any person, company or corporation in this State for the use of water supplied to any city and county, or city or town, or the inhabitants thereof, shall be fixed, annually, by the board of supervisors, or city and county, or city or town council, or other governing body of such city and county, or city or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Any board or body failing to pass the necessary ordinances or resolutions fixing water rates, where necessary, within such time, shall be subject to peremptory process to compel action at the suit of any party interested, and shall be liable to such further processes and penalties as the legislature may prescribe. Any person, company or corporation collecting water rates in any city and county, or city or town in this State, otherwise than as so established, shall forfeit the franchises and water works of such person, company or corporation to the city and county, or city or town, where the same are collected, for the public use.

" ' SEC. 2. The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and the manner prescribed by law.'

" To carry out these provisions of the constitution, the legislature of California passed an act entitled ' An act to enable

the board of supervisors, town council, board of aldermen,' etc., which was approved March the 7th, 1881. (Statutes of California 1881, page 54.)

"In the year 1888 the electors of the city of Los Angeles, pursuant to provisions of the constitution of said State authorizing them so to do, adopted a charter for said city, which charter was, under the provisions of said constitution, submitted to the legislature of said State for its approval, ratification and adoption, and the said charter was, on the 31st day of January, 1889, adopted by said legislature, and thereupon became and ever since has been the charter of the said city of Los Angeles, and by the said charter it is provided, in section 193 as follows:

"'The rates of compensation for use of water to be collected by any person, company or corporation in said city shall be fixed annually by ordinance and shall continue in force for one year, and no longer. Such ordinance shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Should the council fail to pass the necessary ordinance fixing the water rates within the time hereinbefore prescribed, it shall be subject to peremptory processes to compel action at the suit of any party interested.'

"The ordinance of 1897 now sought to be annulled was passed pursuant to the foregoing constitutional and statutory provisions."

A decree was entered for complainants, (appellees,) adjudging that that part of the contract entered into between the city of Los Angeles and Griffin, Beaudry and Lazard, in so far as said contract provides that the city shall not reduce the water rates below those charged on the date of said contract, is valid, and that the ordinance of February 23, 1897, reduced the water rates below those so charged, and "impaired the obligation of such contract, and said ordinance is null and void; and it is further ordered, adjudged and decreed that the said ordinance be, and the same is, hereby vacated and set aside and held for naught."

From the judgment this appeal is taken.

The assignments of error present the contentions discussed in the opinion.

*Mr. S. O. Houghton* and *Mr. Walter F. Haas* for appellants.

*Mr. Stephen M. White* and *Mr. John Garber* for appellees.

MR. JUSTICE MCKENNA, after stating the case, delivered the opinion of the court.

The Circuit Court decided that the provision of the contract executed by the city and Griffin, Beandry and Lazard constituted a contract, and the ordinance of the city regulating the rates of appellees impaired it. Against this conclusion the appellant contends: (1) The contract only purports to bind the city in its corporate capacity—the city as landlord and owner, and not as a governmental agent of the State. (2) The city did not have power to bind the State; (3) the provision of the contract, restraining the city from granting any other franchise, if it created an exclusive franchise, invalidated the whole contract; (4) the act of 1870, purporting to ratify the contract of 1868, is unconstitutional and void; (5) the water company has no power under its charter to collect water rates except as prescribed by the constitution and statutes of the State; (6) by acquiescing in the regulations of rates ever since 1880 the company is estopped from claiming equitable relief, and is guilty of laches; (7) the water rates established by the ordinance are not shown to be lower than those charged in 1868, or, if lower, that the revenue of the company is reduced; (8) if the ordinance is invalid, it is void on its face, and there is, therefore, no cloud on the company's title; (9) the company violated the contract by taking water from the Los Angeles River, and, therefore, is not entitled to specific performance.

We will consider these contentions in their order.

1. The contract only purports to bind the city in its corporate capacity—the city as landlord and owner, and not as governmental agent, of the State.

The argument to support the contention, succinctly stated, is that the right to regulate rates came from the contract, not from the law. In other words, it was reserved from the contract and was a virtual granting back by the lessees of the proprietary

right, which would have otherwise passed by the lease, leaving, however, all municipal powers intact.

The provision of the contract is as follows: "Always provided, that the mayor and common council of said city shall have, and do reserve, the right to regulate the water rates charged by said parties of the second part, or their assigns, provided that they shall not so reduce such water rates, or so fix the price thereof, to be less than those now charged by the parties of the second part for water."

The municipal powers of the city provided in the act of incorporation, among others, were: "To make by-laws or ordinances, . . . to make regulations to prevent and extinguish fires, . . . to provide for supplying the city with water."

It is not denied that the city had power to regulate rates. Indeed, it is insisted that it was so constantly its duty that it could not be contracted away. It was not a power, therefore, necessary to be granted by the contract, and the distinction between the proprietary right and the municipal right, made by appellants, would have been idle to observe. To have limited the right of regulation to the city in one capacity, and left it unrestrained in the other, would have been useless, and such intention cannot be attributed to the parties. We think, therefore, the power to regulate rates was an existent power, not granted by the contract, but reserved from it, with a single limitation—the limitation that it should not be exercised to reduce rates below what was then charged. Undoubtedly there was a contractual element; it was not, however, in granting the power of regulation, but in the limitation upon it. Whether the limitation was and is valid is another consideration.

2. The city did not have the power to bind the State.

This contention as expressed is very comprehensive, and seems to deny the competency of the State to give the city the power to bind it. We do not, however, understand counsel as so contending, nor could they. *Walla Walla* v. *Walla Walla Water Company*, 172 U. S. 1; see also *People* v. *Stephens*, 62 Cal. 209. We understand the argument to be that the power, if not expressly given, will not be presumed unless necessarily or fairly implied in or incident to other powers expressly given—not

simply convenient, but indispensable to them. In other words, the rule of strict construction is invoked against the grant of such power to the city.

The rule is familiar. It has often been announced by this court, and quite lately in *Citizens' Street Railway* v. *District Railway,* 171 U. S. 48.

The effect of the rule in the case at bar we are not required to determine if the act of April 2, 1870, c. 437, Stats. 1869–70, 635, ratifying the contract is valid.

It reads as follows:

" An act to ratify certain acts and ordinances of the mayor and common council of the city of Los Angeles.

" The people of the State of California, represented in senate and assembly, do enact as follows:

" SECTION 1. The following acts, contracts and ordinances of the mayor and common council of the city of Los Angeles are hereby ratified and confirmed: The contract and lease for the care and maintenance of the Los Angeles City Water Works, entered into and made between the mayor and common council of the city of Los Angeles, on the one part, and John S. Griffin, Prudent Beandry and Solomon Lazard, on the other part, dated the twentieth (20th) day of July, eighteen hundred and sixty-eight (1868;) and also the ordinance confirmatory of the same, passed July the twenty-second (22d), eighteen hundred and sixty-eight, which contract and ordinance are recorded in the office of the county recorder of Los Angeles County, in book one of miscellaneous records, pages four hundred and twenty-eight (428) to four hundred and thirty-one (431;) (here follows certain other ordinances and deeds not affecting the contract in question.) "

Appellants assert that the act violates the following provision of the constitution of the State:

" Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed."

At the time of the passage of the act of 1870, the contract of 1868 had been assigned to the water company, and the facts show that it was applied for and procured on behalf of Griffin,

Beandry and Lazard, and other persons, with the intention of forming a corporation to execute its provisions, and for such purpose they and other persons organized under the laws of the State the Los Angeles City Water Company, the appellee. It is hence argued that the act of 1870 confers franchises on the company by a special act instead of by a general law, and thereby infringes the constitutional provision, and against the existence of such power in the legislature the following cases are cited: *Low* v. *City of Marysville*, 5 Cal. 214; *San Francisco* v. *Spring Valley Water Works*, 48 Cal. 493; *Orville & Virginia Railroad Co.* v. *Plumas County*, 37 Cal. 354; *Spring Valley Water Works* v. *Bryant*, 52 Cal. 132; *San Francisco* v. *Spring Valley Water Works*, 53 Cal. 608; *San Francisco* v. *Spring Valley Water Works*, 48 Cal. 493.

Of these cases, only *Low* v. *City of Marysville* and *Orville & Virginia Railroad Co.* v. *Plumas County* were decided before the passage of the act of 1870.

It was held in *Low* v. *City of Marysville* that the legislature was prohibited from conferring upon a municipal corporation powers other than governmental by a special act. Chief Justice Murray said: " . . . for as it would have been a violation of the constitution to create a corporation by special act, for any other than municipal purposes, it follows that it would be equally unconstitutional to confer special power on a corporation already created. In other words, it would be doing, by two acts, that which the legislature could only do by one; and corporations for almost every purpose might be created by special act by first incorporating the stockholders as a municipal body."

But in *California State Telegraph Co.* v. *Alta Telegraph Co.*, 22 Cal. 398, decided at July term, 1863, a contrary doctrine was announced. It was held that the legislature could grant exclusive franchises and privileges to persons or corporations; that if granted to a person they could be assigned to a corporation, and that a corporation could receive from the legislature a direct grant of special privileges and franchises. The case necessarily involved all of those propositions.

The right and privilege passed on were granted by an act of

the legislature, and consisted of the exclusive right to O. E. Allen and Clark Burnham to construct and put in operation a telegraph line from San Francisco to the city of Marysville. They assigned the right to the California State Telegraph Company. The court said: "The case presents the following questions for our adjudication: 1st, is the act of May 3, 1852, granting certain exclusive privileges to Allen and Burnham, constitutional? 2d, have the plaintiffs the power or right to purchase, hold and enjoy these exclusive privileges?"

Both propositions were answered in the affirmative. Of the second the court said:

"The next and most important question is whether the plaintiff, a corporation, had the power to purchase and hold the special privileges granted by the act to Allen & Burnham. It is not disputed that those grantees had power to sell and convey, for the act specially makes the grant to them or 'their assigns,' thus clearly making the privileges assignable. But it is urged that the clause in the constitution which prohibits the legislature from creating a private corporation by special act equally prohibits them from conferring any powers or privileges of a corporate character by special law; and that all the powers and privileges which a corporation can exercise or hold must be derived from a general law, applicable alike to all corporations.

"It is clear that the constitution prohibits the legislature from 'creating' corporations by special act, except for municipal purposes; and it is equally clear that this prohibition extends only to their 'creation.' There is nothing in the language used which either directly or impliedly prohibits the legislature from directly granting to a corporation, already in existence and created under the general laws, special privileges in the nature of a franchise, by a special act, or prohibiting a corporation from purchasing or holding such franchises, which may have been granted to others. To give the constitution any such effect we would be compelled to interpolate terms not used, and which cannot be implied without a perversion of the language employed. To give it such a construction we would have to make it read thus: 'Corporations may be formed, *and other franchises*

*and special privileges granted,* under general laws, but shall not be created *or granted* by special act, except for municipal purposes.' If such had been the meaning intended by the framers of the constitution, they could have easily expressed it in apt words. The language used by them is clear, and they well knew that it included but one of a numerous class of franchises, the subjects of legislative grant, and that a regulation of one could not by any reasonable implication be extended to others not mentioned."

And the learned justice who delivered the opinion of the court concluded the discussion by saying: "I hold, then, that the plaintiffs, as a corporation, were capable of receiving a grant of these special privileges directly from the legislature, and of purchasing them from the grantees."

There was an implied recognition of the same doctrine in *Spring Valley Water Works* v. *San Francisco,* 22 Cal. 434.

But it is urged by appellants that *Orville & Virginia Railroad Co.* v. *Plumas County,* (decided in April, 1868,) held "that the legislature could not authorize the county to grant special privileges to a private corporation, and this was confirmed in *Waterloo Turnpike Co.* v. *Cole,* 51 Cal. 384, (decided in 1876)." The latter case we may disregard, as it was decided subsequently to the act of 1870. The former case did not decide as contended, nor was the point involved in it. The action was mandamus to compel the county to subscribe to the capital stock of the railroad company under an act of the legislature directing the supervisors of the county to meet at a designated day and take and subscribe to the capital stock of the railroad company.

The defence was not want of power in the legislature to direct the subscription — not want of power in the company to receive it because it was a corporation, but want of power to receive because it was not a corporation. Against this it was urged that the act of the legislature recognized the company as a corporation. To the contention the court replied: "But it is claimed that the existence of the corporation is recognized by the act requiring the county to subscribe to the stock of the company. Admitting such to be the case, that will not overcome the difficulty, for a corporation of this character cannot

be created by legislative recognition; the constitution (art. IV, sec. 31,) prohibiting the creation of corporations, except for municipal purposes, otherwise than by general laws."

It follows, therefore, that at the time of the contract of 1868 and of the passage of the ratifying act of 1870 it was established by the decision of the highest court of the State that the constitution of the State permitted a grant of special franchises to persons and corporations, and permitted the latter to receive assignments of them from such persons or grants of them directly from the legislature. This law was part of the contract of 1868, as confirmed by the act of 1870, and could not be affected by subsequent decisions. *Rowan et al.* v. *Runnels,* 5 How. 134; *Ohio Life Ins. & Trust Co.* v. *Debolt,* 16 How. 416; *Havemeyer* v. *Iowa County,* 3 Wall. 294; *Chicago* v. *Sheldon,* 9 Wall. 50; *Olcott* v. *The Supervisors,* 16 Wall. 678; *McCullough* v. *Virginia,* 172 U. S. 102. Nor by the new constitution of 1879. *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650; *Fisk* v. *Jefferson Police Jury,* 116 U. S. 131; *St. Tammany Water Works* v. *New Orleans Water Works,* 120 U. S. 64.

The subsequent decisions of the Supreme Court of the State have not been uniform. *San Francisco* v. *Spring Valley Water Works* unqualifiedly overruled *California State Telegraph Co.* v. *Alta Telegraph Co.,* but *People* v. *Stanford,* 77 Cal. 360, restored its doctrine to the extent, at least, of holding that the constitutional provision that "corporations may be formed by general laws, but shall not be created by special act," only prohibits the creation of corporations and conferring powers upon them by legislative enactment, and does not prohibit "the assignment of a franchise to a legally organized corporation by persons having the lawful right to exercise and transfer them." See also *San Luis Water Co.* v. *Estrada,* 117 Cal. 168.

There are expressions in the latter case which, it is urged, notwithstanding the modification by it and by *People* v. *Stanford* of the doctrine of *San Francisco* v. *Spring Valley Water Works,* make that doctrine applicable to the case at bar. The San Luis Water Company was a corporation, and was formed for the purpose of furnishing the town of San Luis Obispo and the inhabitants thereof with pure fresh water.

By an act of the legislature, entitled " An act to provide for the introduction of good and pure water into the town of San Luis Obispo," approved March 28, 1872, a franchise was granted for that purpose to M. A. Benrimo, C. W. Dana and W. W. Hays. The San Luis Water Company claimed to be the assignee of the franchise. The assignment was attacked on the ground that it was invalid under the constitution of the State. The court said : " The precise point made is, that the power to supply a city with water cannot be conferred directly or indirectly upon a private corporation by special act."

And further : " The grant to Benrimo and his associates was also to their assigns. There can be no doubt but that they might, by the terms of the grant, sell or assign the franchise. It seems to me too plain to require argument that the purchase by the plaintiff was strictly and directly within its powers and contributed necessarily and directly to its objects and purposes." But the learned commissioner who delivered the opinion also said : " If any connection could be traced between the plaintiff and the passage of the special act of 1872, or it appeared that the act was obtained for the purpose of evading the constitutional inhibition, I could see how the case of *San Francisco* v. *Spring Valley Water Works, supra,* might apply. But, in view of the facts in this case, I cannot regard the article of the constitution mentioned or the case last cited as having any application here." But this is not a decision that the case would apply. And if it is a concession of strength in the argument it is not a concession of conclusive strength.

We are not concerned, however, to reconcile the cases decided since 1870, and we have only mentioned them to present fully the contention of appellants. The cases prior to that time, as we have seen, made the obligation of the contract of 1868, and determined the power of the legislature to ratify it. And there seems to have been no question of this power. Besides legislative recognition, besides recognition by many acts of the city, the contract has received judicial recognition. Taxation upon the property acquired to execute it has been sustained. *Los Angeles* v. *Los Angeles Water Works Co.,* 49 Cal. 638. It was interpreted, and under its provisions the company denied com-

pensation for water used in sprinkling the streets of the city. *Los Angeles Water Co.* v. *Los Angeles*, 55 Cal. 176. An ordinance was declared void imposing a license upon the company for doing business in the city. *Los Angeles* v. *Los Angeles Water Co.*, 61 Cal. 65. Its right to take more than ten inches of water from the river was sustained in *Los Angeles* v. *Los Angeles Water Co.*, 124 Cal. 368.

The case in 61 Cal. 65, was heard in department and in banc, and the contract received careful consideration. The judgment of the trial court was for the water company, and department 2 of the Supreme Court, affirming it, said:

"The court was correct in its judgment. The plaintiff had already reserved a sum to be paid by defendant for the privilege of vending water for domestic purposes, and it could not change its contract in the manner proposed. The privileges granted by the lease and the ordinance of 1868 were already vested in the defendant as strongly as they could be by a license under the ordinance of 1879. A license is a grant of permission or authority. The defendant already had permission and authority granted by ordinance and ratified by the legislature. The city cannot, during the term of the lease, of its own motion, increase the amount to be paid for the privileges granted.

"It is hardly necessary to say that the point made by the appellant, that neither the city nor the legislature can grant or alienate any of the rights of sovereignty, has no application to this case."

The court in banc, through its Chief Justice, approved this language, and after quoting cases, said:

"The authorities of the city of Los Angeles by a contract (the validity of which has not been challenged by either party) and for certain valuable considerations therein expressed, granted to the defendant's assignors the privilege of supplying the city of Los Angeles and the inhabitants thereof with fresh water for domestic purposes, with the right to receive the rents and profits thereof to their own use;" and after citing cases to show that the exaction of the license would impair the obligation of the contract, concluded as follows:

"The principles enunciated in the foregoing cases are emi-

nently, sound and just, and are directly applicable to the case we are now considering. The city of Los Angeles, by its solemn contract, and for various considerations therein stated, gave to the party under whom defendant claims the privilege of introducing, distributing and selling water to the inhabitants of that city on certain terms and conditions, which defendant has complied with, and it was not within the power of the city authorities, by ordinance or otherwise, afterward to impose additional burdens as a condition to the exercise of the rights and privileges granted."

3. The provision of the contract, restraining the city from granting any other franchise, if it created an exclusive franchise, invalidated the whole contract. 4. The act of 1870, purporting to ratify the contract of 1868, is unconstitutional and void. 5. The water company has no power under its charter to collect water rates except as prescribed by the constitution and statutes of the State.

These contentions are dependent upon the same reasoning as the preceding one, and do not require a separate discussion.

6. By acquiescing in the regulations of rates ever since 1880 the company is estopped from claiming equitable relief and is guilty of laches.

There was no such acquiescence as estopped the water company from contesting the ordinance of the city. The facts are that in 1880 the city passed an ordinance to be in effect one year, establishing water rates, and passed one every year thereafter, including 1897, when the one in controversy was passed. The rates established by the ordinances were less than those adopted in 1870, and the latter are claimed to have been not higher than the rates charged in 1868. The company collected the rates established by the ordinances, except those established in 1896 and 1897. A suit was brought by the company to set aside the ordinance of 1896, and that of 1897 is assailed in the case at bar. These ordinances fixed the rates at less than they had been fixed before. The company has also every year since 1882 filed a statement with the city council, showing the names of the consumers of water, the rates paid and the expenditures made for supplying water for the preceding year. The company

always protested against the right of the city to demand statements, and claimed to make them solely for its information. The company also in 1882 protested against the power of the city to fix rates on any other basis that that of the contract of 1868. The city therefore cannot claim to have been deceived by the action of the company in collecting the rates established prior to 1896. They were less, it is stipulated, than those of 1870, but how much less we are not informed. It is true we are not informed how much less those fixed in 1896 and 1897 are than those of the prior years. They are less, "less than they had ever been fixed before," is the stipulation; and they will, according to the stipulation, produce more then fifty thousand dollars less revenue than those of 1870.

Acquiescence in a regulation which, all things considered, may not have been injurious, does not preclude a contest of that which is injurious. It must be remembered that the contract did not forbid all regulation, but only regulation beyond a certain limit. There was no concession of a power to go beyond that limit, but constant protest against it; and when its exercise did go beyond that limit, producing injury not balanced by other considerations, the right to restrain it would naturally be, and we think, could legally be, exerted. As we have said, there was no concealment, no misleading, no injury, no change of condition, no circumstance which could invoke the doctrine of estoppel or of laches. Appellants, however, assert there was, and claim that the acquiescence of the water company was induced by the fear that the city would prevent the unlimited use of the river water—a use beyond the ten inches claimed to be allowed by the contract, and a use against other and proprietary rights of the city. Of the latter the record does not enable us to form a judgment. Of the former the Supreme Court of the State (124 Cal. *supra*) has decided against the contention of the city. We approve the decision and hereafter quote its language. The appellants' inference, therefore, is without the support of anything in the record.

7. The water rates established by the ordinance are not shown to be lower than those charged in 1868, or, if lower, that the revenue of the company is reduced,

To sustain this contention it is claimed by appellants that there is no testimony in the record to show that the rates established in 1897 were lower than those charged in 1868. Appellants say :

" The only thing which complainants rely on to establish this fact is the recital in the report of a committee of the council appointed in 1870 for the purpose of agreeing with the water company upon a schedule of water rates to be charged, in which it stated (by the joint committee) ' that they have established water rates and charges for domestic purposes, taking as a guide, as near as can be, the charges and rates for domestic purposes charged in July, 1868. That your committee have also fixed the rates and charges for other reasonable objects and purposes, and report as follows.' "

It is urged this is not a statement that the rates fixed in 1870 were equal to those of 1868 ; indeed, that they may have been higher. And it is also urged there is a distinction made between rates for domestic purposes and rates for " other reasonable objects and purposes," which may mean not domestic purposes, and as to these it does not appear upon what they were based.

We are not disposed to dwell long on these claims. It is incredible that the city should have demanded statements from the company yearly ; have passed ordinances yearly, and provoked and endured an expensive litigation to establish rates higher than or the same as those which already existed. If statements and ordinances were necessary in fulfilment of the duty of the city under the constitution of the State, neither controversy or litigation was necessary, nor would either have ensued.

It is urged under this head that it is not shown that the income of the water company is less under the rates fixed by the city than under those of 1868. The showing would be irrelevant. The contract concerns rates, not income, and the power of the city over them under the contract.

8. If the ordinance is invalid, it is void on its face, and there is, therefore, no cloud on the company's title.

The contention is that " if the contract of 1868 is valid, and the ordinance of 1897 reduces the income of the company below

that which it should receive, the ordinance is void on its face as being in conflict with the Federal Constitution, and is no cloud on complainants' title."

It is hence deduced that the water company has adequate legal remedies, and cannot resort to an equitable one.

We concur with the learned trial judge that the ordinance is not void on its face. As said by him—

"In the case at bar, however, the ordinance upon its face is valid, 88 Fed. Rep. 747, 748, and its invalidity appears only when considered in connection with the contract of July the 22d, 1868, and evidence showing what the water rates were at that date. While the court takes judicial notice of the ratifying act of April 2, 1870, still, since the provisions of the contract of July the 22d, 1868, are not embodied in said act, I am not sure that said provisions are matters of judicial knowledge, although such seems to be the ruling of the court, (one of the justices dissenting,) in *Brady* v. *Page*, 59 Cal. 52. Conceding, however, that the court will take judicial notice of all the provisions of said contract, still the one in question simply provides that water rates shall not be reduced below the rates then charged, without indicating what those rates were, and therefore the invalidity of the ordinance appears, not upon its face, but only in connection with extraneous evidence of what the rates were in July, 1868, and for this reason complainants have adduced that evidence in the present case."

And further—

"The defendants must either submit to the terms of the ordinance, or incur unusually onerous expenditures. It is reasonably certain that if, with the ordinance standing, they were to undertake the collection of rates in excess of those prescribed in the ordinance, they would be resisted at every point by the consumers of water, and thus be driven to innumerable actions at law. Besides, should they, in any instance, succeed in collecting, without an action, a higher rate than the ordinance prescribes, it is equally certain that they would thereby bring upon themselves protracted and heavy litigation, having for its object forfeiture of their entire system of works. Surely these injuries are irreparable, and actions at law, so far from being adequate

to the exigencies of the situation, are, as complainants, in their brief, forcibly put it, mere mockeries of a remedy."

9. The company violated the contract by taking water from the Los Angeles River, and, therefore, is not entitled to specific performance.

In reply to this contention we may adopt the language of the Supreme Court of the State of California, used on behalf of the court by Mr. Justice McFarland, in *Los Angeles* v. *Los Angeles City Water Company*, 124 Cal. 377.

The contract of 1868 and the right of the water company to take water from the river was considered and decided. The learned justice said:

"Before considering the main questions in the case, it is proper here to notice a preliminary point made by the city, and somewhat insisted on, to wit: That the only quantity of the water of the Los Angeles River to which the water company is entitled under the contract is ten inches under a four-inch pressure. This contention cannot be maintained. The words of the contract on this subject are simply that the company shall not take from the river ' more than ten inches of water without the previous consent' of the city; there is nothing in the contract about ' four-inch pressure,' nor is there any intimation as to what the parties meant by ' ten inches' of water. But, looking at the context and the subject matter of the contract, it is quite evident that the parties did not mean only ten inches under a four-inch pressure. If that had been the meaning, there would have been no sense in the other important covenants. At the time of the contract it would have taken many times ten inches under a four-inch pressure to furnish water for domestic purposes to even the few thousand people who were then inhabitants of the city; and much more than that amount was necessary to supply free water under the contract; and a solemn covenant to supply a growing city with sufficient water for domestic and municipal purposes for thirty years from a flow of ten inches under a four-inch pressure would have been absurd. The company, immediately after the date of the contract, commenced to use an amount of water greatly in excess of ten inches under a four-inch pressure; soon after the execu-

tion of the contract the company was using three hundred inches under a four-inch pressure, and from that to the present time they have been using, with the knowledge and consent of the city, from three hundred to seven hundred inches so measured. Therefore, whatever (if anything) was meant by the simple words 'ten inches,' the contract was immediately, and has been continuously, construed by the action of the parties as meaning more than ten inches measured under a four-inch pressure. There is no pretence that the city ever objected to the use of this water by the water company until 1896, when an ordinance was passed by the city government undertaking to withdraw the city's consent to the taking of more than ten inches from the river. It is difficult to imagine how this ordinance was passed seriously; for if the water company had been prevented from taking from the river at that time more than ten inches of water under a four-inch pressure, there certainly would have been a water famine in the city, for the city had no works of its own and no means whatever for supplying water for either domestic or municipal purposes. But the city, having allowed the water company, for nearly thirty years, to divert the quantity of water above mentioned, and to expend vast sums of money upon the faith of a continuance of the right to take said water, could not withdraw its consent within the period of the contract."

The learned justice then quoted and approved the following remarks of the Circuit Court in the case at bar:

"'If it be conceded, as claimed by defendants, (which, however, I do not decide,) that the provision of the contract, limiting the quantity of the water to be taken from the river without previous consent of the city, is sufficiently certain for enforcement, or, more specially, that said quantity is ten inches measured under a four-inch pressure, still the consent of the city to the taking of a larger quantity, once given, cannot be withdrawn during the life of the contract, for the reason that large expenditures have been made by complainants in reliance upon such consent.' The court cites as authorities to the point: *Rhodes* v. *Otis*, 33 Ala. 600; 73 Am. Dec. 439; *Woodbury* v. *Parshley*, 7 N. H. 237; 26 Am. Dec. 739; *Lacy* v. *Arnett*, 33 Pa. St.

169; *Russell* v. *Hubbard*, 59 Ill. 339; *Beall* v. *Marietta &c. Mill Co.*, 45 Ga. 33; *Veghte* v. *Raritan Water Power Co.*, 19 N. J. Eq. 153; *Wilmington &c. R. R. Co.* v. *Battle*, 66 N. C. 546; *Flickinger* v. *Shaw*, 87 Cal. 126; 22 Am. St. Rep. 4; *Grimshaw* v. *Belcher*, 88 Cal. 217; 22 Am. St. Rep. 298; *Smith* v. *Green*, 109 Cal. 228, all of which sustain the point."

*Decree affirmed.*