PHILEMON WOODRUFF

*v.*

THE MAYOR AND CITY COUNCIL OF EAST ORANGE.

[Submitted July 7th, 1906. Decided July 25th, 1906.]

1. Where a city was authorized by *1 Gen. Stat. p. 649* § *9* to ordain and establish ordinances, resolutions and regulations for fixing and collecting water rents or prices for water, and an ordinance fixing rates reserved to the city the right at any time to set and maintain a metre on any service pipe, and to charge the metre price after all water was delivered through any service pipe according to the amount indicated by the metre, the establishment of water rates by the municipal authorities in the exercise of their judgment could not be controlled by this court except for inequality or some similar reason.

2. The reasonableness of the rates as against water consumers generally could only be called in question by the supreme court in the exercise of its supervisory jurisdiction by means of a writ of *certiorari.*

3. Where a city was authorized to fix rates for the furnishing of water to its inhabitants, it was entitled to classify the consumers with reference to the line of business in which they were engaged.

4. A water rate, fixed by municipal authorities, of $2.25 per thousand cubic feet of water, which was charged by metre measurement against all boarding-house keepers in the city, was not objectionable for unreasonableness nor as an unjust discrimination against such users and in favor of ordinary residents who were assessed at a "fixture rate," it appearing that the metre and fixture rate were about equal *per capita.*

———— .

On final hearing on bill, answer and proofs.

*Mr. Alfred F. Stevens,* for the complainant.

*Mr. Jerome D. Gedney,* for the defendant.

PITNEY, V. C.

The complainant, Mr. Woodruff, is the owner of a dwelling-house and lot in the corporate limits of the city of East Orange,

which dwelling is supplied with water for domestic purposes by the defendant, the municipal corporation of that city.

The gravamen of the bill is that the defendant, in fixing its charges against the complainant's house for its supply of water, has discriminated against complainant in such a manner as to charge him a much greater sum for the same supply and service of water than is charged by it to other houses of the same size and situation as complainant's house. And he asks this court to enjoin the defendant from so doing.

It is alleged by the bill and admitted by the answer and clearly appears by the proofs that prior to about three years ago the borough was supplied with water for domestic and other purposes by a private corporation, and that at about that time defendant purchased the distributing plant and supply of the private corporation, and shortly after acquired a new source of water about ten miles away and erected a plant thereon and commenced to supply itself and its inhabitants with water. Two years or more elapsed between the time of the purchase of the private plant and the time, January 1st, 1905, when the new supply was introduced. In the meantime the city was obliged to purchase from the city of Newark a quantity of water to supplement the amount it could obtain from the supply of the old company. I stop here to say that I am satisfied from the evidence that that supply was ample if a very large portion of it had not been wasted and allowed to escape from open and leaky faucets into the then complete sewer system of the city.

In all this the city was acting under the authority of the act of the legislature of April 21st, 1876. *P. L. 1876 p. 366; 1 Gen. Stat. p. 646.*

Section 9 of that act (*1 Gen. Stat. p. 649*) provides that the municipal authorities shall have authority "to ordain and establish ordinances, resolutions and regulations　*　*　*　for fixing and collecting the water rents or prices for water." No question was raised but that under that act the city had power to fix rates.

The municipal authorities of East Orange, acting upon that authority, on the 28th of July, 1903, adopted an ordinance fixing

the rates for the supply of water to domestic consumers upon two plans.

One I shall call the "fixture" plan, also called the "fixed and assessed" rate, and the other the "measured" plan.

The fixture plan was a fixed sum for each faucet, kitchen boiler, bath tub, water closet, and for each horse, cow and carriage.

The other plan was by the measure, and was at the rate of $2.25 for one thousand cubic feet of water, which equals seven thousand five hundred gallons, and which amounts to thirty cents per thousand gallons.

(Hydraulic engineers make use of the unit of a cubic foot of water for measuring water power, and the unit of one gallon in dealing with water for domestic purposes. Why this confusing practice is maintained I cannot conceive. Metres for measuring water for all purposes register the amount passing in cubic feet.) Under the system in use by the private company at the time of the purchase by the defendant of its works, metres were not in use, but charges to consumers were based entirely upon the number and character of fixtures in the houses and grounds of consumers.

The same ordinance which fixed these rates expressly reserved the right to the city at any time to set and maintain a metre upon any service pipe, and to charge the metre price after all water is delivered through any service pipe according to the amount indicated by the said metre.

Later on the city resolved to install metres in all houses used as boarding-houses, and this was done.

Complainant's house, being at the time used as a boarding-house, a metre was therein installed on or before the 1st day of October, 1904, and the house was charged for water by the amount used from that time until the filing of this bill in August, 1905, and thence up to October 1st, 1905.

The complaint of the complainant is that the result of charging his house by the metre was to increase the rate charged to him nearly four times.

That will appear by the following statement:

The charge by the metre continued until the 1st of Septem-

ber, 1905, a period of eleven months, and amounted to $56.85, an average of $5.17 per month, which equals $62.02 per year. The charges by the fixture would have been $16.25 per year. (A careful scrutiny of the complainant's bills show that he was, by mistake, overcharged $2.97 for the month of June, and actually paid that much more than was warranted by the water actually consumed.)

Now, the question is whether the defendant's conduct in installing a metre in complainant's house, which produced the result of increasing his water rates so greatly, is so inequitable and unjust that this court ought to interfere.

Unless it is inequitable and unjust to him as an individual I can see no ground upon which this court can assume jurisdiction.

The power to establish water rates is clearly given by the statute to the municipal government, and the exercise of their judgment in that matter cannot be called in question in this court except on some such ground.

Its reasonableness as against water consumers generally can only be called in question by the supreme court in the exercise of its supervisory jurisdiction by the machinery of the writ of *certiorari.* This proposition seems to me so clear in reason and so thoroughly established by authority that I shall abstain from citing authorities thereon.

The case is in marked contrast with the case of *Long Branch Commission* v. *Tintern Manor Water Co., 70 N. J. Eq. (4 Robb.) 71.* There the water rates were fixed by the defendant, a private water company, and the question was how much the water company ought to charge in the aggregate, and how that amount should be distributed between the municipality at large and the citizens, and again as between the citizens themselves. Manifestly this court was the only tribunal which could stand between a private corporation and the municipality and its citizens. Besides, the question of jurisdiction of this court was distinctly waived and both parties agreed to submit to it the question of the reasonableness of the water company's charges.

At the hearing herein a large amount of evidence was gone

into and admitted, under objection, showing the total cost of defendant's works and the present income therefrom, with the object of showing that it was charging and collecting from the individual water takers more than the circumstances required. The argument was put forth that the defendant and its officers were putting the whole cost of maintenance upon the water takers, and that the city, as such, was obtaining not only a monied profit on the investment, but were using a large quantity of water for public schools and drinking fountains and sewer flushing and the like free of charge, and that the general rates to the water takers should be reduced, and a portion of the interest, charges, &c., for maintaining the works should be charged to and collected from the taxpayer at large. I came to the conclusion during the production of the evidence, for the reasons just stated, and am confirmed therein by further consideration, that this court cannot and ought not to deal with that question. It is not either within the proper scope of the bill or within the general jurisdiction of the court. And farther on in the production of the evidence I understood, and the minutes show, that counsel for the complainant acquiesced in the view I expressed, that the complainant's right to relief must be based wholly on an unjust discrimination between his house and that of other houses in the city.

For the elucidation of the only question—discrimination—left in this case I was assisted by the evidence of two well-known and eminent hydraulic engineers, Mr. Vermeule, for the complainant, and Mr. Sherrerd, for the defendant, and the merits and demerits of the two systems of fixing water rates, namely; that by the fixture and that by the measure or quantity used, were gone into at length.

All hydraulic engineers agree that the fixture system, which was almost exclusively in use in East Orange when the city assumed control of the water-supply, was and necessarily is very unequal in its application. This is owing, in part, to the fact that the number and character of the fixtures does not ordinarily indicate the number of the consumers and the amount consumed by each, and more especially in this case, because the city was and is thoroughly sewered, so that there is no check to

the waste of water by carelessness in leaving faucets open and by leaky fixtures.

All admit that the metre system is the fairest of the two, provided provision is made for casting a part of the burden of the construction and maintenance of the works upon the public at large, so as to reach unimproved property facing upon water mains, and to equalize, in part, the difference in frontage of individual dwellings.

All agree that no system can produce precise equality.

Before dealing with the evidence of these gentlemen I will notice another circumstance.

When the city commenced to supply itself from the old works and was obliged to purchase water from Newark, it found that it was using about one hundred and eight gallons per day per head of its population of twenty-five thousand.

This is a most extravagant use of water for a city like East Orange, which is composed almost entirely of residences and having within its boundaries no factories or other establishments consuming an unusual quantity of water. I am thoroughly convinced, and I think I may say it is almost common knowledge, that such a city can actually use no more than from thirty to forty gallons per head per day for strictly domestic purposes. Street sprinkling and washing and sewer flushing may, in the dry season, increase that consumption to fifty and possibly sixty gallons per day per head. All beyond that is pure waste.

Now, the city of East Orange immediately set about investigating and testing means for a reduction of that excessive consumption. The result was that it succeeded very shortly in reducing the consumption to between eighty and ninety gallons per head.

One test it made was to install metres in a considerable number of ordinary houses and ascertain the amount of water that was consumed before notice was served on the occupant that the house would be charged by the quantity consumed, and then observing the effect upon the amount of consumption after the notice was served that it would be charged by the metre. The result of this test, as detailed by its local superintendent and

engineer, Mr. Reimer, was astonishing to anybody who, by experience and observation, had not been already convinced that the difference would be very great. The consumption in some instances, as I recollect the evidence, was reduced to one-tenth of the amount previously passing through the metre. And in all these instances an observation was made of the number of persons occupying the house in which the test was made, with the result that it was shown that, after the parties were notified that they were to be charged by the quantity used, the consumption fell to between thirty-seven and forty gallons per head per day. This *per capita* consumption was verified by the amount consumed by the complainant's house during the period here in question.

Acting upon this information the municipal authorities decided to place metres in all boarding-houses, and did so, including the complainant's, so that if the authorities were justified in resorting to classification, as I think they were, and as the authorities cited by the defendant hold, they have worked no greater injustice upon the complainant than upon every other house kept as a boarding-house in the city.

Coming now to the evidence of the experts. The theory of Mr. Vermeule is that the charge by the gallon fixed by the municipal authorities is much higher—about double that of the charge by the faucet—and to make them equal, he thinks the charge by the gallon should be reduced from $2.25 per one thousand cubic feet, which is thirty cents per thousand gallons, to fifteen cents per thousand gallons.

He reaches that result by the following mathematical reasoning:

The present annual income from the domestic consumers is $93,500. Now Mr. Vermeule takes the quantity of water which is daily supplied to the city, as measured at the pumping station, and after allowing about ten per cent. for waste and loss, he shows that if the city received pay for all that actually passes through the faucets of its consumers at thirty cents a thousand gallons it would receive an income from those consumers of at least double the amount it actually now receives.

The answer of Mr. Sherrerd to this reasoning is twofold.

*First.* That it is by no means certain that the high proportion of water at the pumping station or receiving reservoir, assumed by Mr. Vermeule to reach the faucets of the consumers, is reliable, but says that statistics of other cities and towns show an average of much less reaching the faucets and much more being lost in distribution.

And in the *second* place he argues that if all the water used for domestic purposes were measured and the consumers charged for it by the gallon the amount consumed would be reduced from between eighty and ninety gallons per head to in the neighborhood of forty gallons per head.

This reasoning is fully sustained by the experience of other towns and cities and by the experiments of Mr. Reimer, the East Orange engineer, above referred to. They showed that as soon as consumers were notified that they were to be charged by the gallon or cubic foot they stopped the enormous waste they had been indulging in and confined themselves to actual use and reduced their consumption accordingly.

To this reasoning Mr. Vermeule replies that it is not worth while for the city to install metres in all the dwellings at a great initial expense of $60,000, or more, and maintain them thereafter at an annual expense in reading and repairs of two or three dollars each, because, he says, the saving in pumping will not equal the increased cost due to the interest on the first cost of the metres and the annual inspection and repairs. He says the city already has an ample pumping plant which is not worked up to its most economical capacity in order to supply the city; that it has accommodations at its plant for and has in its employ three complete shifts of engineers and firemen that are able to pump in twenty-four hours much more water than the city at present uses with all its waste, and that the only saving will be in a trifle of coal.

This aspect of the case is really, for reasons already stated, in my judgment not within my province.

But since it was gone into so extensively I will venture to say that in my opinion Mr. Vermeule's theory is not well founded.

If the city can, with two shifts of men working fourteen or fifteen hours a day instead of three shifts, pump all the water

that is necessary for the city, it can certainly save one shift of men, besides the coal.

Moreover, since it is the duty of the city to equalize as nearly as practicable the burden of the maintenance of the water plant, much may be said in favor of the position that such duty involves the establishment of a universal metre system, and the counsel for the defendant declared that it was the intention at present of the city to establish such a system.

Moreover, I will venture the observation that it is a serious question whether it is entirely consistent with a sound public policy and true civic virtue to encourage and persist in such a wanton waste of potable water as is now the fashion in many cities, and was exemplified·in that of East Orange. Mr. Vermeule estimates that he has procured for that city a supply of twelve million gallons a day and has fortified it by buying the land for a considerable distance in each direction from the driven wells which supply it, so that no other municipality can ever encroach upon that supply. Now, is it quite right for the city of East Orange to secure for itself a supply of water three or four times that which it can ever need for the legitimate supply of all the population that can in all human probability ever become inhabitants of its territorial limits to the exclusion of others equally meritorious who may hereafter need it? There are those who assert that it is the duty of the government to regulate, distribute and limit the amount of potable water that any one centre of population can appropriate for itself.

But the defendant met this argumentation on the part of the complainant so far as regards its unjust discrimination against it by some actual experiments.

Mr. Sherrerd testified that a sort of general introduction of metres into the city of Newark took place very recently (notoriously for the purpose of checking waste), and that he chose fifty-three of those houses in which metres had been placed as they came on the water department books, omitting factories and what may be termed not ordinary cases, and he applied to them the annual charges by the figures found in the East Orange scale (which is the same as the Newark scale) as they were

recorded on the Newark books just prior to the insertion of the metres, and he found that the total amounted for one year to $1,151.25.

He then took the readings of the metres of the same houses as recorded on the Newark water department books and applied the East Orange charge of thirty cents per thousand gallons, and found that it amounted to $1,169.87, a difference of $18.62, or an increase of about one and one-half per cent.

He was severely cross-examined as to the choice of these fifty-three water takers, and left me entirely satisfied that they were fair samples of the sort of houses found in East Orange.

If this is a fair test it shows that there is no difference between the rate by the fixture and by the metre at thirty cents per thousand gallons.

Further, Mr. Sherrerd swears that the Newark metre rate for domestic use is fifteen cents per thousand gallons, one-half of the East Orange rate, and when he came to install metres in these dwellings in Newark he found the income very seriously reduced in all small dwellings or dwellings with small families, who were willing to take the trouble to economize, and he found himself obliged to charge an initial or minimum rate of $4 each year in order to make up in part for the loss. He found that the Newark rate was too low; that is, lower than is sufficient to keep up the income of the department to the proper level. Newark supplies a great number of factories and fixes a low rate to them by way of encouragement.

Further, defendant's engineer produced fifteen instances in East Orange where the result of introducing metres and charging by the gallon was absolutely to reduce the amount below the fixture rate. By the fixture rate the fifteen houses were charged $421 per year. By the gallon those charges amounted to but $399.15 per year.

But another test was applied by me at the hearing, which in some respects may be considered more satisfactory than that of Mr. Sherrerd, just recited.

The receipts by the city from domestic consumers amounted in one calendar year to $93,500.

The population by the late census was twenty-five thousand, which shows a charge of $3.74 per head. Mr. Vermeule thought that the actual population was twenty-seven thousand five hundred, which would be at the rate of $3.40 per head. A close examination of the complainant's water bills from October 1st, 1904, to September 1st, 1905, shows a consumption for the eleven months of twenty-five thousand two hundred and sixty-seven cubic feet, which was divided as follows:

|  |  |
|---|---|
|  | 31,000 cubic feet. |
|  | 14,800 |
| From October 1st, 1904, to May 8th, 1905, the amount consumed was | 16,200 cubic feet. |
| A new metre seems then to have been placed, the total reading of which, up to August 31st, 1905, was | 9,067 cubic feet. |
| Making a total of | 25,267 cubic feet. |
| Which, at $2.25 per hundred cubic feet, comes to | $56 85 |
| One-eleventh of that is | 5 17 |
| Which, added to $56.85, would make the total cost for one year of | $62 02 |

The same treatment of the number of cubic feet shows the total for the year to have been twenty-seven thousand five hundred and sixty-four cubic feet, or seventy-five and one-half per day, which is equal to five hundred and sixty-six gallons per day.

Now, the family occupying the complainant's house as tenants consisted of a husband and wife and three servants and ten steady bed boarders and five table boarders. If we count the actual family occupying the beds at fifteen we have them consuming at the rate of thirty-seven and seven-tenths gallons per head per day. If we count the table boarders at half heads we have them using a little over thirty-two gallons per head. This rate of consumption agrees with what Mr. Sherrerd estimated it ought to be in a house like that, used for purely domestic purposes, and it corroborates and agrees with the numerous test metres placed by Mr. Reimer in other houses. This result as to a natural and legitimate *per capita* consumption of a city like East Orange is particularly significant, because, as by the contract between complainant and his tenants, he assumed the

burden of paying the water bills, the tenants and their boarders had no particular pecuniary interest in being saving in the use of water.

Now, to ascertain how much this amount of $62.02 is per head, we divide it by fifteen, if we count only the bed boarders, and we have $4.13 each per year, or a sum a trifle more than the whole amount collected came to, divided by the population.

If we count in the five table boarders, we have them paying at the rate of $3.10 each per year. If we count the five table boarders as two and one-half persons, as I think we should, because water is used in preparing food and washing dishes and table linen, we have them paying $3.54 each. This result shows that the complainant has not been seriously overcharged.

But complainant's bills show, as before remarked, that for six months, namely, from February to July, inclusive, a considerably larger amount was used than for the other five months, which indicates some leak or carelessness during that period, so it is not certain that the average amount which I have found used by and charged to the complainant is not greater than it would have been if proper economy had been used.

If, then, the complainant has been charged for the use of the water in his house a sum of money no greater *per capita* of its occupants than that charged *per capila* to the other inhabitants of the city, it is difficult to see how he has been injured or discriminated against. Presumably his tenants have had and used all the water they needed. If so, all they or he has lost is the privilege and opportunity of wasting a large quantity of water which has probably been indulged in and enjoyed by his neighbors.

The evidence shows that the governing body of the city, when it undertook the, to it, quite novel task of arranging its schedule of rates, acted with due care and exercised the best judgment of its members. It inquired into the rates charged in many other towns and cities and by private companies. The metre rate adopted is not higher than that charged in many other towns and cities.

Every presumption must be made in favor of the validity of the action of such a body.

In this case there is not the least reason to suspect the good faith of each of its members nor to suspect that any one of them supposed that any inequality of burden would result from the enforcement of the rates adopted.

I mention this aspect of the case because I do not wish it to be understood that if I had come to a different conclusion on the facts I should have felt justified in interfering in the absence of some positive fraudulent conduct on the part of the city authorities.

It is further to be remarked that the action of the city authorities in fixing the rate in question was experimental. They had not, at the moment, any data by which they could intelligently deal with the question before them. They have since ascertained the whole cost of their new works and the cost of their maintenance and administration. It is entirely within their province to determine how that expense should be distributed between the taxpayers at large and the water consumers, and it is quite probable that when they come to act upon their experience they will see fit to reduce the rate of water by measure.

I have pretty carefully examined the various authorities cited by counsel so far as they have come within my reach. One which seems to me to be very much in point and to go much farther than it is necessary to go here is *Parker* v. *City of Boston, 1 Allen (Mass.) 361 (1861)*. That, as here, was a bill in equity to restrain the city of Boston from enforcing against the complainant, a hotelkeeper in that city, certain water rates assessed upon him. There, as here, the water board, under authority of the city, was empowered to fix rates and did so by an ordinance, and according to it the plaintiff's hotel, being valued at over $15,000 was charged $3 per year for each bed for boarders and lodgers. But the city also had the right, under the ordinance, if, upon inserting a metre in the hotel it appeared that it used over ten thousand gallons per day, to charge a minimum rate of two cents per hundred or twenty cents per thousand gallons. This was done in that case with the result that the assessment was raised from $57.40 for three months up to $206.19, the amount charged by the metre. The bill was dismissed and all the remarks of the court, found

"An assessment for a quarter of a year, made by the water registrar under the direction of the water board of Boston, at the rate of two cents for each one hundred gallons of water used in a hotel in Boston, the daily consumption of which, as measured by a water metre placed therein under the provisions of the city ordinance, exceeds ten thousand gallons a day, is legal, although water metres have been put into only a portion of the hotels in Boston, and although the assessment, if made according to the provisions of the city ordinance applicable to hotels into which no water metres have been put, would have amounted to only about one-fourth as much." .

I will refer to some of the other cases reported. *San Diego Water Co.* v. *San Diego, 118 Cal. 556; 38 L. R. A. 460; Spring Valley Water Works* v. *San Francisco, 82 Cal. 286; 6 L. R. A. 756.* These and several others of the same character were cases where the municipal authorities fixed rates for a private company supplying the municipality with water. *Los Angeles* v. *Los Angeles City Water Co., 177 U. S. 558; 88 Fed. Rep. 720; Wagner* v. *Rock Island, 146 Ill. 139; 21 L. R. A. 519; 34 N. E. Rep. 545; Exchange Building Co.* v. *Roanoke Water and Gas Co., 90 Va. 83; 17 S. E. Rep. 789; Mobile* v. *Bienville Water-Supply Co., 130 Ala. 379; Griffin* v. *Goldsboro Water Co., 122 N. C. 206; Sheward* v. *Citizens Water Co., 90 Cal. 635; 27 Pa. Rep. 439; Young* v. *Boston, 104 Mass. 95.*

I will therefore advise a decree that the bill be dismissed, with costs.