# APPALACHIAN ELECTRIC POWER CO. v. SMITH et al. *

### No. 494.

District Court, W. D. Virginia.

March 29, 1933.

*Decree reversed 67 F.(2d) 451.

See, also, 4 F. Supp. 3.

John L. Abbot, of Lynchburg, Va., Newton D. Baker, and Raymond T. Jackson, both of Columbus, Ohio, John Draper, of Pulaski, Va., and Curtis, Mallet-Prevost, Colt & Mosle, of New York City, for plaintiff.

Huston Thompson, Sp. Asst. to Atty. Gen., Seth Richardson, Asst. Atty. Gen., and Oswald Ryan, Gen. Counsel, Federal Power Commission, Jas. F. Lawson, Asst. Gen. Counsel, Federal Power Commission, and Willard W. Gatchell, Atty., Federal Power Commission, all of Washington, D. C., and Jos. C. Shaffer, U. S. Atty., of Wytheville, Va., for defendant.

WAY, District Judge.

Appalachian Electric Power Company, a public service corporation under the laws of Virginia (hereinafter called plaintiff) filed its bill of complaint against George Otis Smith, Frank R. McNinch, Ralph B. Williamson, Marcel Garsaud, and Claude L. Draper (hereinafter called defendants), seeking injunctive and other relief on account of alleged unlawful and unconstitutional action taken, and orders entered, by defendants and their predecessors in office while purporting to act as the Federal Power Commission (herein called the Commission), with respect to a "declaration of intention" filed by plaintiff's assignor, New River Development Company, and an application made by plaintiff to the Commission for a license or adjudication, pursuant to the provisions of section 23 of the Federal Water Power Act (USC, title 16, § 817 [16 USCA § 817]).

The bill seeks the removal of the cloud alleged to have been cast by said finding and orders upon plaintiff's title to real estate situate in this judicial district, and, after setting forth the jurisdictional requirements, alleges the following:

That plaintiff owns in fee and is in possession of approximately 2,550 acres of land, together with certain flowage and other rights and interests in lands, situate along and in New river, Pulaski county, Va., the chief value of which consists in their adaptability for water power development and desires to construct thereon a water development project consisting of a dam, appurtenant power station, and other necessary works. The proposed development will comprise a dam across New river above Radford and upstream from the mouth of Little river, which will create a reservoir 19 to 21.5 miles long and absorb the fall of about .116 feet, occurring between Allisonia, Va., and the proposed site. The drainage area at the site is approximately 2,400 square miles, and the reservoir will cover about 4,000 acres to an average depth of approximately 10 feet so that the utilizable storage will be about 40,000 acre feet.

New River Development Company, above referred to as plaintiff's assignor, is a public service corporation organized under the laws of Virginia. In June, 1925, that corporation filed with the Commission (which body was then composed of the Secretaries of War, Interior, and Agriculture) a "declaration of intention" to construct, operate, and maintain said water development project. The declaration stated that there is no navigation in that part of New river except ferries, and no navigation of the stream for about 160 miles below the proposed site.

The original bill alleges that New river at the site of the proposed development is "not navigable in fact and is not a navigable water of the United States." That part of the bill as amended, now reads: "6. New River at the site of the said development is a fresh water, non-tidal stream; the site of said development is located approximately one hundred and fifty-five miles upstream from the head of navigation on the Kanawha River, to which river the said New River is tributary, and said development does not involve the use of any land or other property of the United States."

The bill alleges that it is proposed to provide the dam with ample floodgates and spillways, and to operate the project so as not to impair the navigable capacity of the stream below, nor to affect the interests of interstate or foreign commerce. A writing signed by New River Development Company, attached to the declaration and entitled, "Statement with reference to Application for Permit or License," states that, "if the Commission should find that the project will affect the interests of interstate or foreign commerce," declarant, upon receipt of advice to that effect, "will consider and determine whether the declarant proposes to apply for a permit or for a license."

In September, 1926, plaintiff, having obtained with the consent of the Commission an assignment of said declaration of intention, filed an application with the Commission for a license for the proposed development. The letter transmitting said application requested that action on the declaration of intention filed by New River Development Company be deferred for consideration at the same time as the application for license by Appalachian Electric Power Company. In the application for license, plaintiff stated: "The minimum flow proposed to be released during periods of low water shall be such amount as shall be required for the purposes of power, navigation, flood control and municipal water supply. The proposed ponding of water will

tend to equalize seasonal variations, to increase the minimum flow during low water periods and reduce flood peaks below the project;" and that the project proposed is "on the following named stream; New River. Navigable and carrying commerce to the following extent: None, but tributary to the Kanawha River, which is navigable and carrying commerce up to Montgomery, W. Va., 155 miles below the project."

### Proceeding by the Commission with Respect to the Declaration and Application for License.

At this point it is desirable to set forth an outline of the action taken by the Commission with respect to the declaration of intention and application, as disclosed by annual reports of the Commission, some of which reports are referred to and quoted in the bill of Complaint.

The declaration was referred to the chief of engineers for investigation and report, and a report thereon unfavorable to plaintiff was made. At plaintiff's request the Commission returned the papers to the chief of engineers for the consideration of additional data furnished by plaintiff. Upon reconsideration, the chief of engineers filed a second report. His first report said:

"This river is one of the principal tributaries of the Kanawha River, which has been improved for about 90 miles by the construction of 10 locks. It is really the Kanawha River under another name, and the flow if not properly regulated could have an adverse effect on navigation during low water stages in the Kanawha River.

"To fully protect the interests of interstate or foreign commerce any license granted should be made subject to the following conditions:

"1. That the licensee shall permit a continuous flow past its dam not less than the low-water flow of the stream as determined by the records of the stream gauging stations required by the preliminary permit, subject to such modifications as the Secretary of War may prescribe in the interests of navigation, and shall not at any time interfere with the natural flow of the river to such an extent as to interfere with or impede navigation.

"2. That the operations of the licensee, in so far as they affect the use, storage, and discharge of the river shall be controlled by such reasonable rules and regulation as the Secretary of War may prescribe in the interests of navigation."

The second report of the chief of engineers concluded as follows: "So far as can be predicted from available data and records it would not be possible to operate the proposed project so as to adversely affect navigation on the Kanawha River under the existing project." 6th Ann. Rep. Fed. Power Com. pp. 135, 136.

It appears that after study of the application by the Commission's staff, and consideration of additional data not before the chief of engineers, plaintiff was informed that it was proposed to recommend that the Commission find the proposed project would affect the interests of interstate and foreign commerce. At the request of plaintiff's counsel, a hearing was held by the Commission in March, 1927, at which no new data was submitted, but arguments were made and briefs filed.

After the second or revised report of the chief of engineers, the Commission's staff appears to have considered the results of tests of the variation in power plant discharges upon certain rivers in California. That data tended to support the conclusion that, if daily fluctuations of considerable magnitude are created in the Kanawha river, they will require at low stages of the river frequent operation of the movable dams, a use for which they are not intended, thereby increasing the difficulty and expense of maintaining conditions suitable for navigation. Continuing, the report of the Commission says: "Experience on the Kanawha River has shown that no depletion of water supply in a dry season can be made without materially increasing the difficulty of maintaining conditions suitable for navigation. The proposed works have ample capacity not only to decrease the flow in the Kanawha River in considerable amount over long periods in the low-water season, but to cause such variation in daily river discharge as seriously to interfere with operation of the navigation facilities. Under such circumstances it is believed to be the duty of the Commission 'to take all needed measures to preserve the navigability' of the Kanawha River; and that these measures can be taken only by requiring the dam to be constructed under a license containing such conditions as will avoid the possibility of serious interference with navigation." 6th Ann. Rep. Fed. Power Com. pp. 136–137.

On account of the different conclusions reached by the executive secretary of the Commission and the chief of engineers in the latter's second report, the Commission directed that the case with the additional data collected subsequent to that report be resubmit-

ted to the chief of engineers for further consideration. In July, 1926, General Deakyne, then chief of engineers, filed a report, the concluding paragraph of which says: "I therefore report that there is reason to believe that in the future exceptionally dry seasons may occasionally occur during which the proposed project near Radford, if unregulated, might adversely affect the navigable capacity of the Kanawha River."

Subsequent to that (third) report the Commission appears to have received additional data indicating to what extent variations in discharges produced by irregular power plant operation may persist on the stream below the power plant. 7th Ann. Rep. Fed. Power Com. pp. 113–114.

On June 1, 1927, following these hearings, investigations, and reports above, the Commission adopted the following resolution: "In the matter of the declaration of intention, under the provisions of Section 23 of the Federal water power act, of New River Development Co., a corporation organized under the laws of the State of Virginia, to construct a dam and other structures across and in New River in the vicinity of Radford, Pulaski County, State of Virginia, said dam and other structures being part of a power project proposed to be constructed for the purpose, inter alia, of the development and utilization of power, said declaration having been submitted to the Commission under date of June 26, 1925; the Commission having caused investigation of such proposed construction to be made and it appearing from such investigation and from reports submitted thereon that said project, unless operated in the interests of interstate or foreign commerce in accordance with the requirements of said act, would have an adverse effect on such interests, but if operated in accordance with such requirements would materially benefit such commerce, thereupon found that said river in the part thereof involved in said declaration is not 'navigable waters' within the definition thereof in said act, but that the interests of interstate or foreign commerce would be affected by such proposed construction." 7th Ann. Rep, Fed. Power Com. 1927, p. 114; Bill as amended, par. 16.

The Commission thereupon tendered a standard or major form license for the proposed project which the company has not accepted.

The license so tendered was made expressly "subject to all the terms and conditions of the Act and of the rules and regulations of the Commission pursuant thereto as amended and made effective on the first day of April, 1924, as though fully set forth herein, which said rules and regulations are attached hereto and made a part hereof," and subject, also, to the numerous conditions and restrictions set forth in 26 articles, three only of which (articles 1, 18, and 21) are here set out, in substance:

"Article 1" provides that the license will be issued for fifty years from its date, and that, in consideration of the benefits and advantages accruing thereunder to the licensee, "it is expressly agreed by the Licensee that the entire project, project area and project works as hereinafter designated and described, whether or not located in, on or along said New River or upon lands of the United States, shall be subject to all the terms and conditions of this license," etc.

Article 18, in effect, provides that the licensee shall agree that the amount to be entered upon its fixed capital accounts "as representing the actual legitimate cost thereof and the actual legitimate investment therein up to the date of this license, whether consisting of expenditures actually made, of charges accrued, or of liabilities or obligations incurred, shall be determined by the Commission in accordance with the provisions of the Act and of the regulations established thereunder"; and that the licensee shall upon completion of the project file with the Commission a complete detailed statement showing the "actual legitimate cost" of the entire project.

"Article 21. After the first twenty years of operation of said project under this license, out of surplus earned thereafter, if any, accumulated in excess of a specified, reasonable rate of return upon the actual, legitimate investment of the Licensee in said project, all as defined in and determined by the provisions of regulation 17 of said rules and regulations of the Commission, the Licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment," etc.

The parts of Article 21 not quoted provide how the "specified reasonable rate of return upon the actual, legitimate investment of the Licensee in such project" is to be determined and applied or set aside. Article 21, it will be noted, is to be considered in connection with "net investment,"[1] as defined by the act,

[1] " 'Net investment' in a project means the actual legitimate original cost thereof as defined and in-

and with section 14 of the Act (16 USCA § 807), which latter section provides that, upon not less than two years' notice in writing from the Commission, the United States shall have the right upon the expiration of any license to take over and operate the project after paying to the licensee its "net investment"[1] not to exceed the fair value of the property taken.

Plaintiff promptly notified the Commission that it would not accept the license, and in February, 1930, requested the Commission to reconsider the finding made on June 1, 1927, and to disclaim jurisdiction over the proposed development, or, alternatively, to issue a minor part license pursuant to section 10 (i) of the Act (16 USCA § 803 (i). In the letter requesting disclaimer of jurisdiction plaintiff challenged the jurisdiction of the Commission over the proposed development, but indicated that, in order to avoid controversy and save time, it was willing to accept a minor part license containing only such conditions as are appropriate to prevent any substantial interference with the navigable capacity of the Kanawha river as would be unlawful under the Rivers and Harbors Act of March 3, 1899 (USC, title 33, § 403 [33 USCA § 403]).

The Commission took no further definite action upon the application until after defendants in December, 1930, became members thereof. The newly constituted Commission held a hearing relative to the extent of its jurisdiction over plaintiff's proposed development, in February, 1931, at which representatives of Virginia, West Virginia, Kentucky, Arkansas, Tennessee, and plaintiff appear to have made objection to the Commission's exercising jurisdiction over the proposed development, except such as may be "lawful, necessary, appropriate and relevant for the protection of the interests of the United States in navigable waters."

On April 3, 1931, defendants entered the following order respecting plaintiff's application:

"1. That the motion of the applicant company to reconsider the finding of June 1, 1927, 'that the interests of interstate or foreign commerce would be affected by such proposed construction' be and the same is hereby denied;

"2. That the application, dated October 6, 1930, for a minor part license for this project be and the same is hereby denied; and

"3. That the applicant shall be tendered a standard form license under the Act, and it is hereby ordered that it shall not proceed with construction until it shall have received and accepted such license."

In May, 1931, defendants tendered plaintiff a standard or major form license containing provisions similar to those in the first license, and to certain of which plaintiff had objected, especially to those in articles 1, 18, and 21, already referred to. This latter license has not been accepted, and plaintiff avers that it has no intention to accept it.

In June, 1931, plaintiff filed its bill of complaint charging that the finding in the orders entered by the Commission on June 1, 1927, and April 3, 1931, to the effect that the construction of said project would affect the interests of interstate or foreign commerce, is without any substantial evidence to support it, or, at most, is contrary to the clear weight of the evidence; that, in so far as the Commission assumes to assert jurisdiction over plaintiff's development and to find that it will affect the interests of interstate or foreign commerce and to require plaintiff to accept the standard form license tendered, as a condition precedent to such development, such action is unlawful, unconstitutional, and void; and that said orders and finding, by reason of the facts shown, are a cloud upon plaintiff's title to its said lands and rights, and so long as they remain in apparent force and effect will continue to constitute such cloud and will destroy the value and divert said lands and rights from their most valuable and adaptable use to plaintiff. Plaintiff asserts its willingness with respect to the proposed development to be subject to such reasonable laws, rules, and regulations as are necessary and are lawfully imposed by the United States or any of its duly constituted

terpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission,' plus similar costs of additions thereto and betterments thereof, minus the sum of the following items properly allocated thereto, if and to the extent that such items have been accumulated during the period of the license from earnings in excess of a fair return on such investment: (a) Unappropriated surplus, (b) aggregate credit balances of current depreciation accounts, and (c) aggregate appropriations of surplus or income held in amortization, sinking fund, or similar reserves, or expended for additions or betterments or used for the purposes for which such reserves were created. The term 'cost' shall include, in so far as applicable, the elements thereof prescribed in said classification, but shall not include expenditures from funds obtained through donations by States, municipalities, individuals, or others, and said classification of investment of the Interstate Commerce Commission shall in so far as applicable be published and promulgated as a part of the rules and regulations of the commission." USC, title 16, § 796 (16 USCA § 796).

agencies for the protection of navigation in interstate and foreign commerce. It charges, however, that the regulations attempted to be imposed are unnecessary, unrelated to the protection of navigation, and are violative of the Fifth and Tenth Amendments of the Constitution of the United States.

Plaintiff apparently has no direct right of appeal from or review of the orders and finding complained of and desires to proceed with the construction of the proposed project, but is prevented from so doing by the order entered by defendants on April 3, 1931.

In substance, the bill challenges the regulation of plaintiff's proposed project attempted by the Commission, as not being in accordance with the provisions of the Federal Water Power Act, but in excess of the authority and power which that act confers upon the Commission; and, alternatively, that, if the Commission has correctly interpreted the act, then the act is unconstitutional and void in so far as it attempts to authorize the regulation and supervision which the Commission has undertaken to exercise.

The cause came on for hearing on defendants' motion to dismiss, which challenges the bill, among others, upon the following grounds:

1. Lack of jurisdiction over either the defendants or the subject matter of the controversy;

2. That former members of the Commission, and New River Development Corporation, are necessary parties to this proceeding;

3. Impossibility of the court's entering any enforceable order or decree, granting the relief prayed for;

4. That this is in substance and effect a suit against the United States and the Federal Power Commission, not authorized by an act of Congress;

5. That said actions taken by defendants and their predecessors in office involved the exercise of administrative discretion and are not subject to judicial review;

6. That plaintiff voluntarily applied to the Water Power Commission for a determination, under the provisions of section 23 of said act, of its rights to construct said power project, and, having obtained a determination thereof by the Commission, is barred and estopped from seeking injunctive relief in the courts;

7. That the bill shows on its face that defendants have correctly interpreted the Water Power Act; that the said act is constitutional and valid; and that the orders made and finding complained of by defendants are valid and lawful and do not constitute any cloud on the title to the lands and rights of plaintiff.

1. The question of the court's jurisdiction of the subject-matter of the controversy, and of the parties as well, has already been decided by Judge Henry C. McDowell before whom this proceeding was formerly pending. A motion to quash and set aside the service of process was duly made by defendants, based upon the theory that this court was without jurisdiction. In an opinion by Judge McDowell ([D. C.] 4 F. Supp. 5), he said with respect to the merits of that motion:

"The orders of the Federal Power Commission in question are documentary assertions of power by the Commission over the plaintiff's use and enjoyment of its property; these orders have been made public records; these orders, if made without lawful authority, must largely impair the value of the property as a source of credit, and must greatly restrict the plaintiff's right of ownership, and its use of its property. If the orders are invalid, and as their invalidity does not appear on the face of the orders, they must of necessity be clouds on the plaintiff's title. Sufficient authority for this conclusion is found in City of Los Angeles v. Los Angeles City Water Co., 177 U. S. 558, 581, 20 S. Ct. 736, 44 L. Ed. 886; Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 386, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Id. (D. C.) 297 F. 307, 310.

"In so far as the character of this suit is concerned, I can see no substantial distinction between an illegal assertion by a defendant of ownership of the real estate claimed by the plaintiff, and an illegal assertion by the defendant of a highly important power of control over the use that may be made by the plaintiff of the real estate in question.

"It follows that the defendants' motion to quash must be overruled, and the defendants given a reasonable time within which to file such pleading as they may be advised to file."

2. Defendants urge that five former members of the Commission are necessary parties defendant to this proceeding. This is claimed particularly with respect to Messrs. Davis, Work, and Jardine (former Secretaries of War, Interior, and Agriculture, respectively), who made the order and finding of June 1, 1927.

It seems apparent that, if these former members are made parties defendant and directed to set aside and expunge the order and

finding of June 1, 1927, they will be powerless to obey any such order of the court. Under the provisions of the Act of June 23, 1930 (USC, title 16, § 792 [16 USCA §| 792], 46 Stat. 797), defendants, in their official capacities, are the members of and constitute the Commission. The former members of the Commission have no greater power or authority with respect to the orders complained of than do any other citizens of the United States. That being true, it is clear that they are not necessary or proper parties to this proceeding.

The contention that New River Development Company is a necessary party plaintiff is also without merit. It clearly appears from the bill of complaint that plaintiff has acquired in fee simple and is in possession of about 2,550 acres of land in, along, and near New river in Pulaski county in this judicial district, upon which plaintiff desires to construct and operate the proposed power project. It likewise appears that New River Development Company, with the consent of the Water Power Commission, assigned and transferred to plaintiff, some time before the orders and finding complained of were made by defendants or their predecessors in office, the declaration of intention filed by the development company with the Commission in June, 1925. So far, at least, it does not appear, from the record or otherwise, that the development company has any interest in this litigation which entitles or requires it to be made a party thereto in any capacity, or that the failure to make that corporation a party can in any way prejudice the rights of defendants or prevent the court from giving complete relief in the event plaintiff's contentions are upheld.

3. It is further contended on behalf of defendants that the bill demonstrates the impossibility of the court's entering against the defendants, or any of them, sued as individuals, any order which they as individuals could carry into effect. While the problem of how the court is to enforce its orders so that the relief prayed for may be afforded plaintiff, if it should finally be decided that plaintiff is entitled to that relief or to a substantial part of it, is one not entirely free from difficulty, it, nevertheless, seems to the court that it is a problem the solution of which can very well be postponed until the proper stage in the proceedings is reached. It may appropriately be added here that it is not readily to be expected that a governmental body or agency of the importance of the Federal Power Commission, in the event it is finally decided in this case that the Commission, as charged in the bill, has exceeded its authority under the act in the particulars of which complaint is made or has acted under an unconstitutional statute, would hesitate promptly and willingly to make its record conform to the final decree. I think it would be unjust to the Commission to assume anything other than that in the event of a final decision adverse to defendants' contentions the Commission would willingly expunge the orders in question and make the Commission's records conform to the applicable law as finally determined by the courts.

4, 5. Is this in substance and effect a suit against the United States and the Federal Power Commission, not authorized by an act of Congress? Manifestly, if the United States or the Federal Power Commission in the latter's capacity as a governmental agency, and apart from the individuals who constitute its membership at a given time, is a necessary party to this suit, then the motion to dismiss must be sustained, since it is not claimed that there is any act of Congress expressly or impliedly authorizing a suit of this character against the United States or the Commission.

The test in such cases is whether the persons sued, in taking the action complained of, have acted within, or in excess of, their lawful authority. In Philadelphia Company v. Stimson, Secretary of War, 223 U. S. 605, at page 619, 32 S. Ct. 340, 344, 56 L. Ed. 570, it is said:

"If the conduct of the defendant constitutes an unwarrantable interference with property of the complainant, its resort to equity for protection is not to be defeated upon the ground that the suit is one against the United States. The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded. Little v. Barreme, 2 Cranch, 170, 2 L. Ed. 243; United States v. Lee, 106 U. S. 196, 220, 221, 1 S. Ct. 240, 27 L. Ed. 171, 181, 182; Belknap v. Schild, 161 U. S. 10, 18, 16 S. Ct. 443, 40 L. Ed. 599, 601; Tindal v. Wesley, 167 U. S. 204, 17 S. Ct. 770, 42 L. Ed. 137; Scranton v. Wheeler, 179 U. S. 141, 152, 21 S. Ct. 48, 45 L. Ed. 126, 133. And in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process. The principle has frequently been applied with respect to state officers seeking to enforce unconstitutional enactments. Osborn v. Bank of United States, 9 Wheat. 738, 843, 868, 6 L. Ed.

204, 229, 235; Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447; Pennoyer v. McConnaughy, 140 U. S. 1, 10, 11 S. Ct. 699, 35 L. Ed. 363, 365; Scott v. Donald, 165 U. S. 107, 112, 17 S. Ct. 262, 41 L. Ed. 648, 653; Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819; Ex parte Young, 209 U. S. 123, 159, 160, 28 S. Ct. 441, 52 L. Ed. 714, 728, 729, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Ludwig v. Western Union Telegraph Co., 216 U. S. 146, 30 S. Ct. 280, 54 L. Ed. 423; Herndon v. C., R. I. & P. Ry. Co., 218 U. S. 135, 155, 30 S. Ct. 633, 54 L. Ed. 970, 976; Hopkins v. Clemson Agr. College, 221 U. S. 636, 643–645, 31 S. Ct. 654, 55 L. Ed. 890, 894, 895, 35 L. R. A. (N. S.) 243. And it is equally applicable to a Federal officer acting in excess of his authority or under an authority not validly conferred. Noble v. Union River Logging R. R. Co., 147 U. S. 165, 171, 172, 13 S. Ct. 271, 37 L. Ed. 123, 125, 126; American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 S. Ct. 33, 47 L. Ed. 90.

"The complainant did not ask the court to interfere with the official discretion of the Secretary of War, but challenged his authority to do the things of which complaint was made. The suit rests upon the charge of abuse of power, and its merits must be determined accordingly; it is not a suit against the United States."

And in Colorado v. Toll, Supt. Rocky Mountain Nat'l Park, 268 U. S. 228, at page 230, 45 S. Ct. 505, 506, 69 L. Ed. 927: "The object of the bill is to restrain an individual from doing acts that it is alleged that he has no authority to do and that derogate from the quasi-sovereign authority of the State. There is no question that a bill in equity is a proper remedy and that it may be pursued against the defendant without joining either his superior officers or the United States. Missouri v. Holland, 252 U. S. 416, 431, 40 S. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984; Philadelphia Co. v. Stimson, 223 U. S. 605, 619, 620, 32 S. Ct. 340, 56 L. Ed. 570."

One of the most widely cited and quoted decisions on this question is United States v. Lee, 106 U. S. 196, 1 S. Ct. 240, 261, 27 L. Ed. 171, a proceeding in ejectment instituted by the Lee heirs to recover possession of "Arlington" which was alleged to have been unlawfully seized and held by certain persons purporting to act as officers of the United States. In the majority opinion by Mr. Justice Miller, it is said:

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.

"It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."

Among the numerous authorities relied on by defendants as sustaining their contention that this is in reality a suit against the United States and the Federal Power Commission is Ferris et al. v. Wilbur, Secretary of the Navy (C. C. A. 4th) 27 F.(2d) 262, 264. The instant case is, I think, clearly distinguishable from the Ferris Case, which involved the right of the government to store quantities of high explosives in the Navy Mine Depot at Yorktown, Va. The Secretary of the Navy and the Commandant of the Mine Depot were sued in their "official" capacities. The land upon which it was proposed to store the explosives was owned by the United States. The constitutionality of the act of Congress under which the storing was being done was not challenged, and there was no serious contention that the government officials were acting in excess of the authority conferred by the act of Congress. The bill in this case presents an entirely different situation. Defendants are sued as individuals, while the action of which complaint is made is asserted to be unlawful, either because defendants' action is in excess of the authority conferred on them by the act of Congress on which they rely for their authority, or that act of Congress is unconstitutional and void. The distinction between the two classes of cases is clearly and forcefully illustrated in the opinion by Judge Parker in the Ferris Case, from which the following quotation is taken: "There is an obvious distinction between such a case and one where defendant is sued as an officer of the government, and it is sought to restrain him from action taken in the exercise of a discretion reposed by Congress in the Executive Department. Where the act complained of is not authorized by statute, or where the statute authorizing it is void because in conflict with some provision of the Constitution, the person attempting it may be restrained in a proper case, notwithstanding his claim that he is acting in his official capacity. In such case he is acting, not within the law, but outside it, his act is not the act of the government, and the law affords

him no protection for what he is doing or is about to do. This is true, whether he be the head of a department or merely a subordinate acting under orders; and, if a subordinate, there is no necessity of joining as defendant the head of the department because the orders of the head are immaterial if the act sought to be enjoined is not authorized by law. Colorado v. Toll, supra. These doctrines, however, have no application where, as here, the official is acting under the authority of a statute which does not offend any constitutional provision. In such case his action is the action of the government; if injunction is awarded against him, it is the action of the government, and not his individual action, which is restrained; and the government is consequently a necessary party to the suit, which must fail unless it has consented to be sued."

What has already been said with reference to whether this is in reality a suit against the United States and the Federal Power Commission is equally applicable to the question whether defendants are exercising official discretion in taking the action complained of. The real question involved is whether defendants are acting within their lawful authority or whether their acts are in excess of such authority and therefore unlawful.

It follows that, if defendants have correctly interpreted the Water Power Act, particularly section 23 thereof, and that act is constitutional, they have exercised a discretion reposed in them by law, and the courts are without lawful authority or power to control such discretion. On the other hand, if they have erroneously interpreted the act of Congress and proceeded in excess of the authority which it confers on them, or if those parts of the Act here challenged are unconstitutional and void, then defendants are not exercising a discretion reposed in them by law or acting as a governmental agency, but are subject to be restrained.

If the court correctly understands the case presented by the bill as amended, those are the issues of law which plaintiff seeks to test in this proceeding—whether defendants have correctly interpreted the act, and, if they have, whether the act itself as so interpreted is constitutional—and the conclusion that this entire case turns upon those two questions seems inescapable.

6. Have defendants correctly interpreted the Water Power Act? This question relates to the interpretation which defendants have placed upon section 23 of the act in holding that that section authorizes the Commission, after investigation of the "proposed construction," to require a major or standard form license such as defendants have tendered in the instant case. The Commission, after making the investigation directed by section 23, made a finding that New river in the part thereof involved in the declaration of intention is not navigable waters within the definition thereof in said act, but found that the "interests of interstate or foreign commerce would be affected by such proposed construction."

The first paragraph of section 23 deals with matters not of interest in this controversy. It is the provisions of the second paragraph [2] only of that section which purport to prohibit the construction of the proposed project until declarant shall have applied for and received a license under the provisions of the act. (See footnote.)

Plaintiff takes the position that the only reasonable interpretation which can be given to that part of the act is that it in effect provides that a person intending to construct a project who has doubt as to the character of the waters in which the project is to be constructed, and consequently, as to the jurisdiction of the Commission over the same, may file with the Commission a declaration of intention, whereupon the Commission shall find whether or not the waters in which the proposed construction is to be located constitute in fact navigable waters of the United States of which Congress has jurisdiction under the commerce clause (Const. art. 1, § 8, cl. 3); and consequently that the Commission can assert jurisdiction only if it finds that the waters in which the proposed development is to be located do in fact constitute navigable waters of the United States.

Defendants assert that under such an in-

[2] "Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States, may in their discretion file declaration of such intention with the commission, whereupon the commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not proceed with such construction until it shall have applied for and shall have received a license under the provisions of this chapter. If the commission shall not so find, and if no public lands or reservations are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws." USC, title 16, § 817 (16 USCA § 817) 41 Stat. 1075.

terpretation as that contended for by plaintiff section 23 would become an instrument merely for divesting the United States of its control over feeders or tributaries of navigable waters instead of being a means of control of a water system so that navigability below may be preserved and improved; that, if plaintiff's position is correct, such interpretation would have a very damaging effect upon navigation, as well as upon those desiring to construct water development projects, on the lower reaches of a stream, because there would be uncertainty and serious variations in the flow below if immense reservoirs on the tributaries and feeders could be run and managed by private interests at will and without appropriate regulation and supervision by the United States.

In New Jersey v. Sargent, 269 U. S. 328, at page 336, 46 S. Ct. 122, 124, 70 L. Ed. 289, the Supreme Court, in summarizing the provisions of the Water Power Act, said that it "provides that any person or corporation, including the state or any municipality, intending to construct a dam or other works in a stream not declared navigable 'may in their discretion' file a declaration of their intention with the commission, whereupon it shall by investigation ascertain whether 'the interests of interstate or foreign commerce' will be affected thereby, that if it finds they will be affected the construction shall not proceed unless a license is sought and obtained, and that if it finds the other way the construction may proceed without a license."

An analysis of the second paragraph of section 23 indicates that it excludes from its requirements of a federal license a project in "any stream or part thereof * * * defined in this chapter as navigable waters," and further that, when considered along with paragraph (d) of section 4 (16 USCA § 797 (d), it also excludes from its operation "any stream or part thereof * * * where public lands or reservations of the United States are affected." Those two classes of streams, it will be observed, are dealt with in respect to the licensing of projects therein by the federal authorities, by provisions to be found in paragraph (d) of section 4 of the act.

Section 23 also excludes from its requirements of a federal license "any stream or part thereof," the obstructing of which as proposed would not affect the "interests of interstate or foreign commerce," which evidently refers to obstructions in nonnavigable streams not in any public lands or reservations of the United States, and which would not affect the navigable capacity of any navigable waters of the United States.

But section 23, upon a reasonable interpretation, includes in its requirements of a federal license "any stream or part thereof" ("other than those defined in this chapter as navigable waters"), "and over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States," which language I interpret to have reference to the construction of a dam or other project works in a stream not declared navigable by the act, but the obstructing of which would affect the navigable capacity of a navigable stream of which such nonnavigable stream is tributary, and thereby affect the "interests of interstate or foreign commerce."

That there is such a class of streams over which Congress has at least a limited jurisdiction is not controverted. U. S. v. Rio Grande Dam & Irrigation Co., 174 U. S. 690, 708, 709, 710, 19 S. Ct. 770, 43 L. Ed. 1136.

To place any other interpretation upon the second paragraph of section 23 would be to hold, in effect, either that that section deals only with navigable waters in the face of the express provision above pointed out, excluding from the operation of that section all streams or parts thereof *"defined in this chapter as navigable waters,"* or that it provides for the licensing of proposed constructions in streams in public lands or reservations of the United States, but, as will be observed, paragraph (d) of section 4 provides for the licensing of dams and project works on or in "navigable waters of the United States" *and* in "public lands and reservations of the United States," so that there was no occasion for section 23 to deal with the licensing of projects in either of those classes of streams.

Manifestly, Congress is without jurisdiction over nonnavigable streams not in public lands or reservations of the United States, the obstructing of which would *not* affect the interests of interstate or foreign commerce.

Therefore, it would seem that the only class of streams remaining over which Congress has jurisdiction and to which section 23 could have reference is that class of nonnavigable streams (not in any public lands or reservations of the United States), the obstructing of which will affect the navigable capacity of navigable waters of the United States, if the flow of such stream is not regulated by Congress.

As already pointed out, paragraph (d) of

section 4 authorizes the Commission to issue licenses for dams or project works on or in navigable waters or in public lands or reservations of the United States; and the same paragraph of section 4 *thereafter further provides* that no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structure affecting navigation have been approved by the chief of engineers and the Secretary of War. From that provision it would seem that Congress intended that the Commission, upon such approval being given by the chief of engineers and the Secretary of War, should have authority to issue a license for a project "affecting the navigable capacity of any navigable waters of the United States."

My conclusion, therefore, is that, while section 23 of the act does not make it compulsory upon any one to apply to the Commission for authority to construct a dam or other project works in any nonnavigable stream, it nevertheless affords a simple method of procedure by which the Commission, as a governmental agency, upon application, shall determine whether or not the "interests of interstate or foreign commerce would be affected by such proposed construction." If the Commission upon investigation finds in the negative, then the project is freed from any apparent subjection to the terms of the Power Act as well as from the provisions of the Rivers and Harbors Act. If, on the other hand, the Commission, upon making the investigation directed by section 23, finds that such proposed construction would affect the "interests of interstate or foreign commerce," that is, would affect the navigable capacity of any navigable waters of the United States, then such declarant, before proceeding with the proposed construction, is required to apply for and to receive a license in accordance with the provisions of the act, that is to say, such license as the Commission may duly determine is best suited to protect the interests of the interstate and foreign commerce that would be affected, and that, in making such determination, the Commission is not limited to granting a minor part license such as is contemplated by section 10 (i) of the act (16 USCA § 803 (i) or to merely providing for compliance with the requirements of the Rivers and Harbors Act. I think the latter conclusion seems apparent when it is noted that the license which declarant is required by section 23 to apply for and receive is *"a license under the provisions of this chapter,"* which language implies that the Commission

has the discretion to require any form of license which the Federal Water Power Act authorizes that body to grant.

6-A. Alleged navigability of New River. Counsel for defendants contend that New river is navigable, historically at least, as far upstream as the mouth of Wilson creek, near the Virginia-North Carolina line, and that the court should take judicial notice of this alleged navigability. They rely on the Economy Light & Power Case, 256 U. S. 113, 41 S. Ct. 409, 65 L. Ed. 847, and Arizona v. California, 283 U. S. 423, 51 S. Ct. 522, 75 L. Ed. 1154, to support that contention. The record in this case discloses that Kanawha river, of which New river is the principal tributary, is navigable up to a point about 155 miles below the site of the proposed dam. But the Commission, upon making the investigation directed by section 23, found that *New river in the part thereof involved in the declaration,* is *not* "navigable waters within the definition thereof in said Act."

To review the numerous acts of Congress and of the Legislatures of Virginia and West Virginia relating to New river, the reports of the chief of engineers and other federal and state government records pertaining to that subject, on which counsel for defendants rely, would unduly extend this discussion. That there is not entire harmony in the conclusions reached by different government engineers with respect to navigability of the river will appear from an examination of the reports. Some of the later reports, particularly, tend to support the view that New river is not in fact navigable. It does appear that Congress, in Rivers and Harbors Appropriation Acts, made appropriations for the survey and improvement of New river from the lead mines in Wythe county, Va., to Greenbrier, W. Va., as follows: 1876, $15,000; 1878, $15,000; 1879, $12,000; 1880, $24,000; 1881, $24,000; 1882, $12,000; 1886, $10,000; or a total of $112,000, all of which, except a small balance, appears to have been expended for those purposes.

However, the Rivers and Harbors Appropriation Act of June 13, 1902, repealed the provisions of the former act of Congress authorizing the survey and improvement of New river, in both Virginia and West Virginia: "Sec. 7. That the provisions of river and harbor Acts heretofore passed providing for the prosecution of work upon the following projects are hereby repealed, and any amounts heretofore appropriated for any of the same now remaining unexpended shall be paid into the Treasury of the United States,

to wit: * * * New River, Virginia and West Virginia.'' 32 Stat. p. 374.

Apparently Congress, since the repealing act, has made no further appropriation for either the survey or improvement of New river above the head of present navigation, which, as already stated, is about 155 miles below the proposed site, although numerous permits for bridges and power dams at points both above and below the site in question have been granted by the federal authorities.

Since the case stands on a motion to dismiss, to justify the court in taking judicial notice of the alleged navigability of that part of the stream here involved, the facts presented by the bill, exhibits, and the public records relied on, should be so clear and convincing as not to leave very serious doubt on that issue. In U. S. v. Mackey et al. (C. C. A. 8th) 216 F. 126, at page 128, the court, in disposing of a similar contention, said: "Voluminous documents are presented in the brief of counsel for the Pollard-Hagan Oil Company of which it is claimed the court below and this court may take judicial notice. We apprehend, however, that, in order to enable the court to sustain a demurrer to a bill by reason of matters of which it took judicial notice, it would require a very clear case, and we are not satisfied that this is such a case." And, in Brown et al. v. Piper, 91 U. S. 37, at page 43, 23 L. Ed. 200, it is said, with reference to taking judicial notice: "Care must be taken that the requisite notoriety exists. Every reasonable doubt upon the subject should be resolved promptly in the negative."

The language of the Supreme Court in U. S. v. Rio Grande, etc., Co., 174 U. S. 690, at page 698, 19 S. Ct. 770, 773, 43 L. Ed. 1136, a case relied on by defendants, seems especially applicable to the case as presented by the motion to dismiss: "It is reasonable that the courts take judicial notice that certain rivers are navigable and others not, for these are matters of general knowledge. But it is not so clear that it can fairly be said, in respect to a river known to be navigable; that it is, or ought to be, a matter of common knowledge at what particular place between its mouth and its source navigability ceases. And so it may well be doubted whether the courts will take judicial notice of that fact. It would seem that such a matter was one requiring evidence, and to be determined by proof. That the Rio Grande, speaking generally, is a navigable river is clearly shown by the affidavits. It is also a matter of common knowledge, and therefore the courts may properly take judicial notice of that fact.

But how many know how far up the stream navigability extends? Can it be said to be a matter of general knowledge, or one that ought to be generally known? If not, it should be determined by evidence. Examining the affidavits and other evidence introduced in this case, it is clear to us that the Rio Grande is not navigable within the limits of the territory of New Mexico."

I think it is manifest that the Supreme Court did not undertake in the Rio Grande River Case to say as a matter of general knowledge that a river, even of the size and importance of the Rio Grande, was navigable at certain points in its upper reaches, but rather refused so to hold, and that the language of the decision indicates that the court's conclusion that the river was not navigable in the territory of New Mexico was based upon an examination of the affidavits and other evidence introduced in the case rather than upon general knowledge of that subject. Other illustrations of the limitations upon the rule sought to be invoked may be found in the following cases: Harrison v. Fite (C. C. A. 8th) 148 F. 781, at page 785; Mintzer v. North American Dredging Co. (D. C. N. D. Calif.) 242 F. 553, at page 559; Producers' Oil Co. v. U. S. (C. C. A. 8th) 245 F. 651, 652; Donnelly v. U. S., 228 U. S. 708, 33 S. Ct. 1024, 57 L. Ed. 1035, citing U. S. v. Rio Grande, etc., Irrigation Co., 174 U. S. at page 698, 19 S. Ct. 770, 43 L. Ed. 1136, and U. S. v. Brewer-Elliott Oil & Gas Co. (D. C. W. D. Okla.) 249 F. 609, where a number of the decisions are reviewed.

On the record and evidence here presented, which the court may properly consider in passing on the question, taking a view favorable to defendants, there still remains grave doubt as to the navigability of *that part of New river involved in plaintiff's declaration.* This is especially true when it is remembered that the Commission itself, acting as a duly authorized governmental agency, after an extended and apparently thorough investigation, found to the contrary. I think that fact alone clearly differentiates this phase of the case from Arizona v. California, 283 U. S. 423, 51 S. Ct. 522, 75 L. Ed. 1154, Economy Light & Power Co. v. U. S., 256 U. S. 113, 41 S. Ct. 409, 65 L. Ed. 847, and other cases cited by defendants. Before considering the nature and extent of the power of Congress under the Commerce Clause of the Constitution, to regulate the flow of nonnavigable streams which are tributary to navigable streams, it is necessary to determine what binding force, if any, the finding made

by the Commission that the interests of interstate or foreign commerce would be affected by the proposed construction, has in this proceeding.

Counsel for defendant adhere strongly to the view that plaintiff, having *voluntarily* applied to the Commission for a determination under the provisions of section 23 of the Water Power Act and obtained the Commission's conclusion on the question of fact presented by such application as to the effect the proposed construction would have on interstate and foreign commerce, is barred from attacking the finding of the Commission in the courts. Plaintiff holds that its asserted right to construct the proposed project is not based upon the Federal Water Power Act at all, but exists independently of that act; that such right is guaranteed by the Constitution of the United States, and, consequently, that said finding of fact made by the Commission is not binding upon plaintiff in the present proceeding, and that it is the plain duty of the court to make its own finding of fact upon that issue.

Manifestly, if the interests of interstate or foreign commerce would not be affected by the proposed construction, the Commission is without jurisdiction to make or enforce any of the proposed regulations and restrictions, which brings out in clear relief the fact that the right asserted by plaintiff is a constitutional right, depending, at least in part, upon whether the interests of interstate or foreign commerce would or would not be affected by the proposed construction. In the opinion by Chief Justice Hughes in Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 294, 76 L. Ed. 598, it is said:

"3. What has been said thus far relates to the determination of claims of employees within the purview of the act. A different question is presented where the determinations of fact are fundamental or 'jurisdictional,' in the sense that their existence is a condition precedent to the operation of the statutory scheme. These fundamental requirements are that the injury occur upon the navigable waters of the United States, and that the relation of master and servant exists. These conditions are indispensable to the application of the statute, not only because the Congress has so provided explicitly (section 3 [33 USCA § 903]), but also because the power of the Congress to enact the legislation turns upon the existence of these conditions. * * *

"In relation to these basic facts, the question is not the ordinary one as to the proprie-ty of provision for administrative determinations. Nor have we simply the question of due process in relation to notice and hearing. It is rather a question of the appropriate maintenance of the federal judicial power in requiring the observance of constitutional restrictions. It is the question whether the Congress may substitute for constitutional courts, in which the judicial power of the United States is vested, an administrative agency—in this instance a single deputy commissioner—for the final determination of the existence of the facts upon which the enforcement of the constitutional rights of the citizen depend. The recognition of the utility and convenience of administrative agencies for the investigation and finding of facts within their proper province, and the support of their authorized action, does not require the conclusion that there is no limitation of their use, and that the Congress could completely oust the courts of all determinations of fact by vesting the authority to make them with finality in its own instrumentalities or in the executive department. That would be to sap the judicial power as it exists under the Federal Constitution, and to establish a government of a bureaucratic character alien to our system, wherever fundamental rights depend, as not infrequently they do depend, upon the facts, and finality as to facts becomes in effect finality in law. * * *

"As the question is one of the constitutional authority of the deputy commissioner as an administrative agency, the court is under no obligation to give weight to his proceedings pending the determination of that question. If the court finds that the facts existed which gave the deputy commissioner jurisdiction to pass upon the claim for compensation, the injunction will be denied in so far as these fundamental questions are concerned; if, on the contrary, the court is satisfied that the deputy commissioner had no jurisdiction of the proceedings before him, that determination will deprive them of their effectiveness for any purpose. We think that the essential independence of the exercise of the judicial power of the United States in the enforcement of constitutional rights requires that the federal court should determine such an issue upon its own record and the facts elicited before it."

I think it is clear from this language of the Supreme Court that the issue of fact here presented as to whether the interests of interstate or foreign commerce would be affected by the proposed construction is one for judicial rather than administrative determination,

and that it is the duty of the court in this case to make its own finding of fact on the issue presented.

█ It does not appear that the rule announced in Crowell v. Benson alters or limits the authority of the court, in passing upon a motion to dismiss, to take judicial notice of matters of common knowledge which contradict the allegations of the bill asserting the constitutional right, particularly where such allegations are more in the nature of conclusions of law than strict allegations of fact. In this connection I refer to those parts of the bill which allege that the findings made by the Commission with reference to the effect of the proposed construction on interstate or foreign commerce is arbitrary and without any evidence to support it, or that it, at most, is contrary to the clear weight of the evidence. Although made in the form of allegations of fact, their correctness or incorrectness must depend upon a fair construction of the facts disclosed by the record and matters of common knowledge which the court may properly consider. Thus, in Arizona v. California, 283 U. S. 423, at page 452, 51 S. Ct. 522, 525, 75 L. Ed. 1154, the Supreme Court said: "The bill alleges that 'the river [Colorado] has never been, and is not now, a navigable river.' The argument is that the question whether a stream is navigable is one of fact; and that hence the motion to dismiss admits the allegation that the river is not navigable. It is true that whether a stream is navigable in law depends upon whether it is navigable in fact; United States v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. Ed. 844; and that a motion to dismiss, like a demurrer, admits every well-pleaded allegation of fact, Payne v. Central Pacific Ry. Co., 255 U. S. 228, 232, 41 S. Ct. 314, 65 L. Ed. 598. But a court may take judicial notice that a river within its jurisdiction is navigable. United States v. Rio Grande Dam & Irrigation Co., 174 U. S. 690, 697, 19 S. Ct. 770, 43 L. Ed. 1136; Wear v. Kansas, 245 U. S. 154, 158, 38 S. Ct. 55, 62 L. Ed. 214 [Ann. Cas. 1918B, 586]. We know judicially, from the evidence of history, that a large part of the Colorado river south of Black Canyon was formerly navigable, and that the main obstacles to navigation have been the accumulations of silt coming from the upper reaches of the river system, and the irregularity in the flow due to periods of low water." And in Morrisette v. Boulevard Bridge Corp. (C. C. A. 4th) 30 F.(2d) 290, our Circuit Court of Appeals held it proper on a demurrer to a common-law declaration to notice judicially facts contradicting the allegations of the declaration. See, also, Pearcy v. Stranahan, 205 U. S. 257, 27 S. Ct. 545, 51 L. Ed. 793; Greeson v. Imperial Irrigation District (S. D. Calif.) 55 F.(2d) 321, and opinion affirming the same (C. C. A. 9th) 59 F.(2d) 529, and U. S. v. Flournoy, etc., Co. (C. C.) 71 F. 576, 577.

█ An examination of the record of the proceedings before the Commission discloses that plaintiff's application and declaration were pending before that body about five years. During that time the Commission held hearings at which plaintiff was apparently afforded full opportunity to present all facts within its knowledge relative to the matter under consideration. It is significant that the bill fails to set forth definitely and specifically any relevant evidence or facts which it contends the Commission disregarded or to specify any arbitrary conduct on the part of that body in arriving at the finding which is challenged other than the ultimate conclusion was erroneous.

It is apparent from the record of the Commission and from facts which may be judicially noticed that the finding of fact challenged was not without evidence to support it or contrary to the clear weight of the evidence.

It appears from the record in this case and from public records which may properly be considered that the drainage area at the site of the proposed dam is estimated by complainant at 2,400 square miles, while the drainage area at the head of navigability on the Kanawha river, 155 miles below the site, is approximately 8,300 square miles. The topography and climatic conditions, including annual rainfall, in that area are substantially the same, so that there is presented a situation where, under unregulated operation of the project, complainant could at will, during droughts such as have not been unusual in recent years, withhold in the proposed reservoir, for considerable periods, the equivalent of one-fourth or more of the entire volume of the stream at the head of navigation on the Kanawha. And it is not unreasonable to suppose that Congress in enacting this law had in mind that there would be numerous similar projects constructed above the head of navigation, on tributaries of navigable streams, throughout the country; that, as applied to the Kanawha river, numerous similar projects would be constructed above the head of navigation, on the New as well as on other tributaries of the Kanawha river, the cumulative effect of which projects, if not regulated, would be such at times as totally to destroy the navigable capacity of that river.

While the court does not deem it proper to take judicial notice of the alleged navigability of New river in the part thereof involved in the proposed project, in the face of the finding by the Commission that that portion of New river is not navigable waters within the meaning of the act, it does take judicial notice of the size and importance of New river as a tributary of the Kanawha. Certainly it may notice that New river was regarded by Congress to be of such size and importance that it appropriated money in seven different years for the survey and improvement of navigation therein between Wythe county, Va., and Greenbrier, W. Va.; that it has been the practice of those desiring to construct bridges and dams across the river to apply for, and the government to grant, permission to that end (31 Stat. 264; 36 Stat. 921; 36 Stat. 922); that on four different occasions since the Repealing Act of 1902 Congress has passed acts relating to the survey of that river (37 Stat. 201, 228; 38 Stat. 1915; 44 Stat. 1020; 45 Stat. 538), and that many acts of the Legislatures of both Virginia and West Virginia, as well as numerous public records of the federal government cited in the brief of defendants, emphasize the size and importance of New river.

It does not seem unjust to the position taken by plaintiff to observe that, in the proceedings before the Commission, and here also, there is at least a tacit admission by plaintiff that unrestricted operation of the proposed development can adversely affect the navigable capacity of Kanawha river. It is stated in plaintiff's application to the Commission that the "proposed ponding of water will tend to equalize seasonal variations, to increase the minimum flow during low water periods and reduce flood peaks below the project," which may reasonably be construed as a mild assertion that operation of the project with due regard to navigation on the Kanawha will have a beneficial effect on such navigation. By what is said here in this connection, it is not meant to convey the impression that there is any concession by plaintiff of the right of the Commission or any other governmental agency to regulate or restrict the project in any way beyond what is reasonably necessary to preserve the navigable capacity of the Kanawha. Plaintiff strenuously denies the existence of any power in Congress, and, consequently, of any in the Commission, beyond what is necessary to that end. This tacit concession is mentioned merely for the reason that the court conceives that the real difference between plaintiff and defendants on this phase of the case is not so much as to the effect the proposed construction will have upon the navigable capacity of the Kanawha, and upon the interstate commerce conducted on that river, as it is with regard to the legal consequences which flow from such effect.

As the court views the matter, the effect the proposed construction would have on interstate commerce as the same is conducted through navigation of the Kanawha river clearly appears, and it is the issue of law arising out of that fact about which the fundamental difference exists.

■■■ 7. Are the provisions of the second paragraph of section 23 of the Water Power Act, as interpreted by the court, unconstitutional and void? With respect to the purposes [3] of the Water Power Act it was suggested by counsel for the state of Virginia in the course of the oral argument that the dominant purpose which the framers of the act had in mind was the regulation of power projects, and that the protection of the navigable waters of the United States was a merely minor or incidental purpose. However, in New Jersey v. Sargent, 269 U. S. 328, 336, 46 S. Ct. 122, 124, 70 L. Ed. 289, the Supreme Court, in discussing the Water Power Act, said: "Some provisions relate particularly to the development of power, some only to improvement of navigation, and others to both, but all taken together suggest, if they do not show, that conservation for the purposes of navigation is a leading object." In considering the validity of the act, certain principles [4] are to be kept in mind, among which is the rule that forbids the court to inquire into the motives which induced Congress to enact

[3] The act is entitled: "An Act To create a Federal Power Commission; to provide for the improvement of navigation; the development of water power; the use of the public lands in relation thereto, and to repeal section 18 of the River and Harbor Appropriation Act, approved August 8, 1917, and for other purposes." 41 Stat. 1063 (16 USCA § 792 et seq.).

[4] Every intendment is in favor of the validity of an act of Congress, and it must be presumed to be constitutional, unless its repugnancy to the Constitution clearly appears. Highland v. Russell Car, etc., Co., 279 U. S. 253, 262, 49 S. Ct. 314, 73 L. Ed. 688; Buttfield v. Stranahan, 192 U. S. 470, 492, 24 S. Ct. 349, 48 L. Ed. 525; United States v. Gettysburg Electric Ry. Co., 160 U. S. 668, 680, 16 S. Ct. 427, 40 L. Ed. 576, and Alabama Power Co. v. Gulf Power Co. (D. C.) 283 F. 606, with footnote at page 611.

And the exercise of the constitutional function is not invalidated by incidental though substantial regulation of another business or activity which may be affected thereby. Brown v. United States, 263 U. S. 78, 44 S. Ct. 92, 68 L. Ed. 171; United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936; Hendersonville, etc., Co. v. Blue Ridge Interurban Ry., 243 U. S. 563, 569, 37 S. Ct. 440, 61 L. Ed. 900.

this legislation. In Arizona v. California, 283 U. S. 423, 455–457, 51 S. Ct. 522, 526, 75 L. Ed. 1154, it is said:

"Into the motives which induced members of Congress to enact the Boulder Canyon Project Act [43 USCA §§ 617–617t] this court may not inquire. McCray v. United States, 195 U. S. 27, 53–59, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Weber v. Freed, 239 U. S. 325, 329, 330, 36 S. Ct. 131, 60 L. Ed. 308, Ann. Cas. 1916C, 317; Wilson v. New, 243 U. S. 332, 358, 359, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; United States v. Doremus, 249 U. S. 86, 93, 94, 39 S. Ct. 214, 63 L. Ed. 493; Dakota Central Tel. Co. v. South Dakota, 250 U. S. 163, 187, 39 S. Ct. 507, 63 L. Ed. 910, 4 A. L. R. 1623; Hamilton v. Kentucky Distilleries [etc.], Co., 251 U. S. 146, 161, 40 S. Ct. 106, 64 L. Ed. 194; Smith v. Kansas City Title & Trust Co., 255 U. S. 180, 210, 41 S. Ct. 243, 65 L. Ed. 577. The act declares that the authority to construct the dam and reservoir is conferred, among other things, for the purpose of 'improving navigation and regulating the flow of the River.' As the river is navigable and the means which the act provides are not unrelated to the control of navigation, United States v. River Rouge Improvement Co., 269 U. S. 411, 419, 46 S. Ct. 144, 70 L. Ed. 339, the erection and maintenance of such dam and reservoir are clearly within the powers conferred upon Congress. Whether the particular structures proposed are reasonably necessary, is not for this court to determine. * * *

"This court may not assume that Congress had no purpose to aid navigation, and that its real intention was that the stored water shall be so used as to defeat the declared primary purpose."

The proposed regulations to which objection is most seriously interposed are the amortization scheme provided by the act and the license tendered, the recapture clause, supervision of the cost of the development, regulation by the federal government of the rates to be charged for power produced and of the issuance and sale of securities based on the proposed power development, and the exaction from plaintiff, as a condition to the granting of permission to construct the project, of an acknowledgment that plaintiff will through such permit obtain from the United States valuable rights, benefits, and advantages to which it was not already entitled as an incident to its ownership of the banks and bed of the stream. These are not the only features of the tendered license which are objectionable to plaintiff, but they principally give rise to the controversy.

It is hardly necessary to add that the constitutional questions involved have been most ably and thoroughly discussed by counsel, both in the oral arguments and briefs. All the decisions, particularly those of the Supreme Court, deemed by counsel to be controlling, have been reviewed and analyzed in the course of the arguments.

No decision definitely defining the extent or limits of the power of Congress to regulate or control the flow of a nonnavigable stream such as New river, which is tributary to navigable waters, has been brought to the attention of the court. In U. S. v. Doughton et al. (January 1933) 62 F.(2d) 936, 938, decided by the Circuit Court of Appeals of this Circuit, the court, not finding it necessary to the decision of the case then before it, refrained from expressing any opinion on the question now under consideration.

After reviewing the arguments and decisions, I am inclined to the view that the principles enunciated by the Supreme Court in the following cases are controlling: New Jersey v. Sargent, 269 U. S. 328, 337, 46 S. Ct. 122, 124, 70 L. Ed. 289; U. S. v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 33 S. Ct. 667, 672, 57 L. Ed. 1063; U. S. v. Rio Grande, etc., Co., 174 U. S. 690, 708, 709, 19 S. Ct. 770, 43 L. Ed. 1136; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570; Greenleaf-Johnson Lumber Co. v. Garrison, 237 U. S. 251, 35 S. Ct. 551, 59 L. Ed. 939; Sanitary District of Chicago v. U. S., 266 U. S. 405, 426, 45 S. Ct. 176, 69 L. Ed. 352; Arizona v. California, 283 U. S. 423, 455, 456, 51 S. Ct. 522, 526, 75 L. Ed. 1154; Willink v. U. S., 240 U. S. 572, 36 S. Ct. 422, 60 L. Ed. 808, and Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U. S. 82, 33 S. Ct. 679, 57 L. Ed. 1083.

The error in plaintiff's contention seems to the court to be the assumption that ownership of the banks and bed of New river carries with it unqualified ownership of the flow of the stream itself with the power which the flow represents. It is said that the power of Congress over a nonnavigable stream is at most of a negative or purely prohibitory character, limited to protective restrictions similar to those which have been carried in the Rivers and Harbors Acts for many years. I am inclined to think that is a too narrow view of the power of Congress to regulate the flow of a nonnavigable tributary which contributes so substantially, as does New river, to the navigable capacity of Kanawha river. I

rather think that it may fairly be concluded from the decisions of the Supreme Court above referred to that the flow of that stream is, under the facts disclosed, impressed with a public servitude or interest for the purpose of protecting, preserving and even enlarging the navigable capacity of Kanawha river, of which navigable capacity New river is an essential part; that the interest of plaintiff in the power of the stream is subordinate to such public right or servitude; that Congress is the sole judge of what means are necessary for the conservation and improvement of navigable capacity so long as the means which it adopts have some positive relation to that purpose; that the power of Congress to preserve and enlarge navigable capacity is continually existent; that it is for Congress to determine when and how that power shall be brought into full force and activity, and its failure, before the enactment of the legislation now under consideration, to employ its full power for the purpose of preserving and improving navigable capacity in no way altered or circumscribed the right to do so when Congress determined that the necessity for such action had arisen.

Thus, in New Jersey v. Sargent, where the Federal Water Power Act was under consideration, the Supreme Court said that the control of navigable waters by Congress includes the adoption of "all appropriate measures to free such waters from obstructions to navigation and to preserve and even enlarge their navigable capacity," while in the Chandler-Dunbar Case the court said, with respect to the power of Congress to regulate interstate commerce, that: "It includes navigation [5] and subjects every navigable river to the control of Congress. All means having some positive relation to the end in view which are not forbidden by some other provision of the Constitution are admissible," and further that: *"For these purposes, Congress possesses all the powers which existed in the states before the adoption of the national Constitution,* and which have always existed in the Parliament in England." (Italics supplied.) In Arizona v. California, the Supreme Court observed that "the fact that purposes other than navigation will also be

served could not invalidate the exercise of the authority conferred, even if those other purposes would not alone have justified an exercise of Congressional power." In the Chandler-Dunbar Case the owner contended that, because of its ownership of the banks and bed of St. Mary's river (a navigable stream), it was also owner of the St. Mary's river and of the "inherent power in the falls and rapids," subject only to the right of navigation, but the Supreme Court said that the flow of the stream of a navigable river is in no sense private property; that private ownership in a great navigable stream is inconceivable, and that Congress, in utilizing the power of the stream for the purposes of navigation, had not deprived the owner of the bed and uplands, or any of its property without due process of law.

In Sanitary District of Chicago v. U. S., 266 U. S. 405, 426, 45 S. Ct. 176, 178, 69 L. Ed. 352, a proceeding seeking to enjoin an agency of the state of Illinois from continuing the diversion of water from Lake Michigan and thereby threatening the navigable capacity of that lake, the Supreme Court sustained the right of the federal government to maintain the suit, saying: "The main ground is the authority of the United States to remove obstructions to interstate and foreign commerce. There is no question that this power is superior to that of the States to provide for the welfare or necessities of their inhabitants. In matters where the States may act the action of Congress overrides what they have done." And in the Rio Grande River Case, 174 U. S. 690, 708, 709, 19 S. Ct. 770, 777, 43 L. Ed. 1136, the court observed, with reference to the provisions of an act of Congress, the validity of which was apparently not questioned, that "any obstruction to the navigable capacity, and anything, wherever done or however done, within the limits of the jurisdiction of the United States which tends to destroy the navigable capacity of one of the navigable waters of the United States, is within the terms of the prohibition." The court then referred to the Croton river, a nonnavigable tributary of the Hudson river, from which the city of New York obtains its municipal water supply, saying: "The question always is one of fact, whether such appropriation substantially interferes with the navigable capacity within the limits where navigation is a recognized fact. In the course of the argument this suggestion was made, and it seems to us not unworthy of note, as illustrating this thought. The Hudson river runs within the limits of the state of New

[5] In Gibbons v. Ogden, 9 Wheat. 1, 190, 6 L. Ed. 23, Chief Justice Marshall said:

"All America understands, and has uniformly understood, the word 'commerce,' to comprehend navigation. * * *

"The word used in the constitution, then, comprehends, and has been always understood to comprehend, navigation within its meaning; and a power to regulate navigation, is as expressly granted, as if that term had been added to the word 'commerce.' "

York. It is a navigable stream and a part of the navigable waters of the United States, so far at least as from Albany southward. One of the streams which flows into it and contributes to the volume of its waters is the Croton river, a nonnavigable stream. Its waters are taken by the state of New York for domestic uses in the city of New York. Unquestionably the state of New York has a right to appropriate its waters, and the United States may not question such appropriation, unless thereby the navigability of the Hudson be disturbed. On the other hand, if the state of New York should, even at a place above the limits of navigability, by appropriation for any domestic purposes, diminish the volume of waters, which, flowing into the Hudson, make it a navigable stream, to such an extent as to destroy its navigability, undoubtedly the jurisdiction of the national government would arise and its power to restrain such appropriation be unquestioned; and within the purview of this section it would become the right of the attorney general to institute proceedings to restrain such appropriation." 174 U. S. 709, 19 S. Ct. 770, 777, 43 L. Ed. 1136.

The obstruction which was the subject of the controversy in the Rio Grande River Case was several hundred miles above the head of navigation in that river. It is true that, in both the Sanitary District of Chicago and the Rio Grande River Cases, the complaint was against permanent diversion of waters, but it is not apparent that irregular impounding and discharging of the water, though not permanently diverting it, may not be equally detrimental to navigable capacity. It would seem to be patent that a first essential to successful navigation is navigable capacity, and that navigable capacity frequently of necessity must include as an inseparable part a great deal more of the stream than is actually capable of navigation, so that the flow of a nonnavigable stream especially in the lower reaches may well be an essential part of navigable capacity.

Are the proposed regulations of plaintiff's power development project unrelated to preserving the navigable capacity of the Kanawha river, and in reality but attempts to usurp power and rights expressly reserved by the Tenth Amendment of the Constitution? Among the cases cited to support that theory are Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas 1918E, 724 (manufacture of goods by child labor); The Child Labor Tax Case, 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21

A. L. R. 1432; U. S. v. C., M., St. P. & P. R. R., 282 U. S. 311, 51 S. Ct. 159, 75 L. Ed. 359; Employers' Liability Cases, 207 U. S. 463, 28 S. Ct. 141, 52 L. Ed. 297; Kansas v. Colorado, 206 U. S. 46, 27 S. Ct. 655, 51 L. Ed. 956; U. S. v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746. If the view which this court takes is correct, then the United States has an interest in the flow of the stream of New river commensurate with the requirements for the proper maintenance of the navigable capacity of the Kanawha. It may be that at different times, depending upon varying conditions, a substantial part, or only a negligible part, or all of the power of that flow will be required for that purpose, but the important point seems to be that the flow of the stream is at all times at least potentially subject to that purpose. That being true, the case here presented would not appear to be one of bare regulation separate and apart from a substantial interest in the subject regulated, as was the situation in the Child Labor Law Cases and the Federal Employers' Liability Case; that is to say, this is not a bald attempt by Congress to interfere in purely internal affairs of a sovereign state by regulating *as a manufacturing business* the generation and sale of hydroelectric current. The proposed regulation is incidental to the preservation of the flow of an *important* stream, in which the public of the United States has a substantial interest. No attempt is made to interfere with the generation of current from the flow of streams where the interests of interstate or foreign commerce would not be affected. The act clearly differentiates between plants which generate hydroelectric current from the flow of streams where the interests of interstate and foreign commerce would not be affected and those instances where such interests would be affected, and provides a definite procedure by which the Commission is to determine to which class a proposed construction belongs, upon appropriate application being made in accordance with the provisions of section 23 of the Act.

With reference to Kansas v. Colorado, 206 U. S. 46, 27 S. Ct. 655, 51 L. Ed. 956, it appears from the report of the case that no claim was made by the United States that the diversion of waters by the state of Colorado, sought to be enjoined, tended to diminish the navigability of the Arkansas river, but that the government sought to control the waters of the river to aid in the reclamation of arid lands. The Supreme Court, quoting in part from the Rio Grande River Case, 174 U. S., at page 703, 19 S. Ct. 770, 43 L. Ed. 1136, said:

"'Although this power of changing the common-law rule as to streams within its dominion undoubtedly belongs to each state, yet two limitations must be recognized: First, that in the absence of specific authority from Congress a state cannot by its legislation destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters; so far at least as may be necessary for the beneficial uses of the government property. Second, that it is limited by the superior power of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States. In other words, the *jurisdiction of the general government over interstate commerce and its natural highways vests in that government the right to take all needed measures to preserve the navigability of the navigable water courses of the country even against any state action.'*

"It follows from this that if in the present case the national government was asserting, as against either Kansas or Colorado, that the appropriation for the purposes of irrigation of the waters of the Arkansas was affecting the navigability of the stream, it would become our duty to determine the truth of the charge. But the government makes no such contention. On the contrary, it distinctly asserts that the Arkansas river is not now and never was practically navigable beyond Fort Gibson in the Indian territory, and nowhere claims that any appropriation of the waters by Kansas or Colorado affects its navigability." 206 U. S. 86, 27 S. Ct. 655, 662, 51 L. Ed. 956. (Italics supplied.)

In the Cress Case, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746, the government sought by means of a lock and dam to raise the waters of the Cumberland river in Kentucky above their natural level, as a result of which, lands on a nonnavigable tributary of the Cumberland, not normally invaded thereby, were permanently subjected to periodical overflows substantially injuring their value. That the Government unsuccessfully contended could be done without compensating the owners of the land thereby damaged.

If the premise that the regulation proposed is of a subject in which the United States has a substantial interest, namely, in the power inherent in the flow of the stream, is correct, it would seem to follow that the United States is not without authority or right, as a condition to the granting of the permission to construct the project, in taking the position that plaintiff through the permit would obtain from the United States valua-

ble rights, benefits, and advantages to which it is otherwise not entitled. Of course, if the power of the United States over the flow of the stream is wholly of a negative or a prohibitory character, alien to any proprietary interest or right in the flow of the stream, then the case is different. But it is not readily perceived how the United States may well have such far-reaching power to preserve and even enlarge navigable capacity in the interest of interstate and foreign commerce entirely separate and apart from a right or servitude in the power of the stream itself. And if the United States does have a substantial right in the power of the stream, although limited to specified purposes, it is not devoid of a right to specify the terms upon which that power may be used for private purposes.

While a number of the proposed regulations are probably far reaching in their effect, and may, at least at first blush, appear to be radical in their nature, this court cannot say on the case presented that they do not bear positive relation to the regulation of interstate and foreign commerce or that the act of Congress authorizing them is unconstitutional and void.

For the foregoing reasons, the motion to dismiss the bill will be sustained.